EL PUEBLO DE PUERTO RICO, apelado, *v.* LYDIA ECHEVARRÍA RODRÍGUEZ, acusada y apelante; EL PUEBLO DE PUERTO RICO, apelado, *v.* DAVID LÓPEZ WATTS, acusado y apelante.

*Números:* CR-86-58 *Resueltos:* 25 de abril de 1991
 CR-86-59

300

306

*Héctor Lugo Bougal*, abogado de la apelante; *Carmen Ana Rodríguez Maldonado*, de la *Sociedad para Asistencia Legal*, abogada del apelante; *Rafael Ortiz Carrión, Procurador General, Norma Cotti*

*Cruz, Subprocuradora General, Ricardo E. Alegría Pons, Josefa A. Román García* y *Nilda P. Fuentes Ortiz, Procuradores Generales Auxiliares,* abogados de El Pueblo.

El Juez Presidente Señor Pons Núñez emitió la opinión del Tribunal.

El presente caso plantea un drama que ha capturado la imaginación pública, tanto por su contenido como por la fama que han tenido en nuestra sociedad sus principales protagonistas. El proceso generó un voluminoso récord de más de cinco mil (5,000) páginas y, en apelación, extensos alegatos. Hemos considerado minuciosamente ese récord y los alegatos, y es en consecuencia de ello que formulamos nuestras conclusiones. No podemos, sin embargo, dejar de reconocer el laudable esfuerzo desplegado en este recurso por los representantes legales de las partes, especialmente cuando consideramos que por circunstancias fortuitas algunos de ellos han advenido a ostentar la representación de sus clientes en apelación sin el beneficio de haberlos representado en el juicio celebrado en instancia.

I

*Breve relación de hechos*

El 14 de abril de 1985 el Ministerio Público de Puerto Rico sometió denuncias contra la Sra. Lydia Echevarría Rodríguez y contra el Sr. David López Watts por los delitos de asesinato en primer grado, secuestro agravado, conspiración y daños agravados.(1)

Tras la celebración de un juicio en su fondo, iniciado el 11 de febrero de 1986 y finalizado el 1ro de mayo del mismo año, el panel de jurados rindió veredicto de culpabilidad contra la señora Echevarría Rodríguez por los delitos de asesinato en primer grado, secuestro agravado y dos (2) cargos por conspiración, mientras que al señor López Watts lo halló culpable por los delitos

_____

(1) Con anterioridad a estas denuncias, la apelante Lydia Echevarría Rodríguez había sido denunciada junto a otras personas por la alegada comisión de este crimen, denuncia que fue eventualmente archivada contra todos los imputados.

de secuestro agravado, dos (2) cargos por conspiración y daños agravados.[2] El 20 de junio siguiente el Tribunal Superior, Sala de San Juan (Hon. Laura Nieves de Van Rhyn, Juez), dictó las sentencias apeladas imponiendo las penas estatuidas con agravantes y disponiendo su cumplimiento en forma consecutiva.[3]

. Según la teoría de Fiscalía,[4] los hechos que originaron las acusaciones —y que fueron creídos por el Jurado— son los siguientes.

A principios de la pasada década la apelante Echevarría Rodríguez estaba sufriendo una crisis matrimonial originada por la separación de su esposo, la cual se agravó por los celos que ella sentía. La situación desembocó en serias desavenencias con su cónyuge, el productor de televisión y destacado miembro de la farándula, Sr. Luis Vigoreaux.

Para mediados de 1982 la apelante comenzó a gestionar la contratación de una persona con el fin de "liquidar", tanto al señor Vigoreaux como a su "amiga", la Srta. Nydia Castillo. Para tales fines se comunicó con quien eventualmente resultó ser el testigo clave de este caso, el Sr. Francisco "Papo" Newman, para que éste se ocupara de encontrar alguna persona dispuesta a realizar su objetivo. A principios del año 1983, Newman consiguió por fin a una persona dispuesta a aceptar la oferta: el aquí apelante Sr. David López Watts. Adujo el Ministerio Público que los apelantes y Newman se reunieron en la casa de la señora Echevarría Rodríguez con el fin de planificar los pormenores del acto delictivo a cometerse. Así las cosas, y tras la ocurrencia de varios incidentes desagradables dentro del triángulo amoroso, la apelante Echevarría Rodríguez procedió a informarle a Newman que para el 17 de enero de 1983 se llevaría a cabo una reunión entre Vigoreaux, ella y sus respectivos abogados en el Condominio El

---

[2] Nótese que David López Watts resultó absuelto por el delito de asesinato en primer grado.

[3] Alegato del apelado, Apéndice VIII, pág. 31.

[4] T.E. de 11 y 12 de febrero de 1986, págs. 2–15.

Centro —en Hato Rey— con el propósito de finalizar los trámites del divorcio.

Con esta información a su haber, Newman y el apelante López Watts se apostaron cerca del lugar donde se celebraba la reunión y esperaron su conclusión. Una vez Vigoreaux se marchó del lugar con su abogado, Newman y López Watts procedieron a seguir el automóvil de Vigoreaux. Éste se dirigió. hasta la oficina de su abogado, donde se quedó este último. Acto seguido, Vigoreaux, solo en su auto, se dirigió en dirección a la residencia de la señorita Castillo. Al detenerse en una intersección en el expreso de Trujillo Alto, con el propósito de virar a la izquierda, Vigoreaux fue interceptado por Newman, quien logró acceso al interior del automóvil por el lado del pasajero con una llave que le suministró la apelante Echevarría Rodríguez y le ordenó a Vigoreaux que se dirigiera a un apartado sector conocido como Los Guanos, en Cupey. López Watts les siguió en el otro automóvil. Una vez arribaron al paraje solitario, López Watts le infligió a Vigoreaux varias heridas con un objeto punzante[5] en distintas partes del cuerpo y luego, dándole por muerto, lo echaron en el baúl de su propio automóvil. Cometida la fechoría, decidieron quemar el vehículo. En ese momento Newman recordó que la apelante le había pedido que sacara un maletín del baúl, y al abrir el mismo, Vigoreaux, aún con vida, le agarró una mano. Entonces Newman le asestó un golpe en la cabeza con una llave de sacar tuercas que estaba en el baúl y volvió a cerrar el mismo. Inmediatamente después, López Watts y Newman se dirigieron a buscar gasolina.[6] López Watts consiguió en la casa de una amiga un envase para la gasolina y compró la misma en una gasolinera sita en Venus Gardens. Regresaron al sector Los Guanos. Allí, Newman regó la gasolina sobre el Mercedes Benz, desechó el envase y procedió a incendiar el auto con la víctima aún viva y aprisionada en el baúl.

---

[5] Según el testimonio de Newman, luego de agredir a Vigoreaux, el "punzón" fue tirado a un pastizal.

[6] López Watts conducía un Mazda, mientras que Newman conducía el Mercedes Benz de Vigoreaux.

Mediante apelación, oportunamente presentada ante nos, la apelante Lydia Echevarría Rodríguez imputa la comisión de quince (15) errores(7) y el apelante López Watts imputa la comisión de diecisiete (17) errores por parte del foro juzgador, los cuales procedemos a analizar a continuación.

## II

*Discusión de los errores imputados al foro juzgador por la apelante Lydia Echevarría Rodríguez*

### A. *Primer señalamiento de error*

El veredicto dictado en el presente caso es contrario a derecho, ya que se basó en la declaración única de Papo Newman, cuyo historial de mendacidad [e] inmoralidad hace su testimonio prueba insatisfactoria e insuficiente para dar validez jurídica a un veredicto de culpabilidad. *Pueblo [v.] Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1974)[;] *Pueblo [v.] Serrano Nieves*, 93 D.P.R. 56, 60 (1966).

Al efecto, las propias instrucciones del Tribunal Supremo de Puerto Rico, adoptadas para casos de esta naturaleza, página 47, establecen:

"En este caso el Ministerio Fiscal ha presentado como testigo de cargo a una persona que supuestamente participó voluntari[a] e intencionalmente en la comisión del delito por el cual se está enjuiciando al acusado. Debido a su supuesta participación en el acto delictivo, dicho testigo está sujeto a ser procesado o encausado por el mismo delito que la persona aquí acusada.

Por esta razón, y ante la posibilidad de que su testimonio pueda estar basado en una promesa de inmunidad hecha por el Ministerio Fiscal, o en cualquier otra circunstancia o beneficio, su testimonio debe ser examinado con desconfianza. Ustedes le darán el peso y credibilidad que le merezca, si alguno, luego de examinar su testimonio con cautela a la luz de toda la evidencia presentada en el caso." Alegato de la apelante, págs. 7–8.

La cuestión medular que obviamente resalta en este primer señalamiento es que el veredicto aquí cuestionado únicamente encuentra fundamento en el testimonio de un solo testigo

---

(7) No obstante levantar quince (15) errores, la apelante renunció a los últimos cuatro (4) señalamientos de error. Alegato de la apelante, pág. 134.

(Newman), quien testificó bajo inmunidad y cuya veracidad quedó en entredicho. Por lo tanto, según la apelante, su testimonio sería insuficiente para validar el veredicto emitido. Este señalamiento acarrea que reiteremos, en primer lugar, la vigencia de dos (2) principios cardinales del sistema de justicia adjudicativo de índole adversativo.

En primer lugar, no existe controversia alguna en torno a la naturaleza que rodea el derecho de todo acusado a que su culpabilidad sea determinada más allá de duda razonable, corolario indiscutible de la presunción de inocencia que establece nuestra Ley Suprema. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1. Por tal motivo, nuestra casuística reconoce a su vez que la apreciación hecha por el juzgador de hechos sobre la culpabilidad de todo acusado es una cuestión mixta de hecho y de derecho, por lo que la determinación de culpabilidad más allá de duda razonable es revisable en apelación *como cuestión de derecho*. *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Miranda Ortiz*, 117 D.P.R. 188 (1986); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608, 621 (1981); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 552 (1974); *Pueblo v. Serrano Nieves*, 93 D.P.R. 56, 60 (1966).

En segundo lugar, la correcta adjudicación a nivel apelativo de la sabiduría que pueda contener un veredicto apelado debe albergar como elemento *sine qua non* que, al apreciar la evidencia presentada, necesariamente debemos reconocer la inigualable posición en que se encuentra el foro juzgador para hacerlo. Por ello, y con el fin de mantener un adecuado balance al evaluar el veredicto recaído, hemos reiterado que en la medida en que los jueces de instancia y los jurados se encuentran en mejor posición de apreciar y aquilatar la prueba presentada, su apreciación merecerá gran deferencia de este Tribunal y no intervendremos con ella en ausencia de pasión, prejuicio, parcialidad o error manifiesto, o cuando un análisis integral de la prueba así lo justifique. *Pueblo v. Fradera Olmo*, 122 D.P.R. 67 (1988), y casos allí citados; *Pueblo v. Márquez y Bermúdez*, 122 D.P.R. 93 (1988),

y casos allí citados; *Pueblo v. Mattei Torres*, 121 D.P.R. 600 (1988); *Pueblo v. Mendoza Lozada*, 120 D.P.R. 815 (1988); *Pueblo v. Bonilla Romero*, 120 D.P.R. 92 (1987).

En este caso, para sustentar su posición, la apelante cita varios extractos del contrainterrogatorio al testigo Newman, para finalmente cuestionar la pertinencia y admisibilidad de su testimonio a base de las disposiciones de la Regla 46(A) de Evidencia, 32 L.P.R.A. Ap. IV. Analizadas las expresiones señaladas por la apelante, entendemos que las mismas realmente son pertinentes a los efectos de juzgar la credibilidad del testigo y que si a alguien podría perjudicar el desfile y la admisión de esta prueba era al Ministerio Público y no a la apelante.

Lo realmente importante en cuanto a este primer señalamiento de error es el argumento de que el testimonio de Newman era insuficiente en derecho para sostener una convicción, por lo que se requería la presentación de evidencia corroborativa del mismo, lo que se alega no ocurrió en este caso. En cuanto a este aspecto, debemos concurrir con la postura del Ministerio Público. Una cosa es requerir la corroboración de la *confesión* de un *acusado* con evidencia *independiente* del *corpus delicti*, a fin de evitar una convicción fundamentada en una confesión falsa, y otra muy distinta es el trato que requiere el testimonio de un coautor del evento delictivo al aquilatarlo como evidencia inculpatoria.

■ El requisito de corroboración de la confesión de un acusado con prueba *aliunde* es una doctrina de sólido arraigo en nuestra jurisprudencia. Sanas normas de prudencia judicial nos han llevado a imponer este requisito con el fin de asegurar que nadie pueda ser castigado por la comisión de un delito con la sola constancia de su propia confesión. *Pueblo v. Fradera Olmo*, supra, pág. 73, y casos allí citados; *Pueblo v. Morales Rivera*, 112 D.P.R. 463, 471 (1982); *Pueblo v. Pérez Fernández*, 95 D.P.R. 919, 922 (1968); *Wong Sun v. United States*, 371 U.S. 471, 488–491 (1963).

■ El testimonio o "confesión" de un coautor que se esgrime contra el acusado no requiere corroboración y se rige por la norma prescrita en la Regla 156 de Procedimiento Criminal:

> El testimonio de un coautor será examinado con desconfianza y se le dará el peso que estime el juez o el jurado luego de examinarlo con cautela a la luz de toda la evidencia presentada en el caso. En los casos celebrados por jurado se le ofrecerán al jurado instrucciones a esos efectos. 34 L.P.R.A. Ap. II.

No obstante su ubicación dentro del ámbito procesal-penal, la función de esta regla es orientar al juzgador de hechos con respecto al valor *probatorio* que ha de merecerle este particular tipo de testimonio. Mediante la misma, se pretende *atenuar su potencial valor probatorio ante los ojos del juzgador* debido a la naturaleza particular de dicho testimonio. En vista de lo expresado, podemos concluir que este error no fue cometido, por cuanto el testimonio de Newman no requería corroboración. Más aún, de los autos surge prueba suficiente que corrobora el mismo. Véanse, en tal sentido, los testimonios citados por el Pueblo (apelado) en las págs. 13–17 de su alegato.

■ Debe añadirse que a pesar de la cautela dispuesta por la regla, una vez aquilatado en esa forma y creído más allá de duda razonable, dicho testimonio es suficiente para sostener la convicción del acusado.

El último segmento de este señalamiento de error nos presenta un argumento que, en síntesis, sustenta que la *admisión* del testimonio de Newman desvirtúa el "espíritu" que anima a la Regla 37 de Evidencia, la cual dispone:

*Descalificación de testigos*

> Una persona no podrá servir como testigo si el tribunal determina que ella es incapaz de expresarse en relación al asunto sobre el cual declararía, en forma tal que pueda ser entendida, bien por sí misma o mediante intérprete, o que ella *es incapaz de comprender la obligación de un testigo de decir la verdad.* (Énfasis suplido.) 32 L.P.R.A. Ap. IV.

■ El señalamiento de la apelante no contiene el alcance que ésta pretende. El hecho de que un testigo sea tachado de "mentiroso compulsivo", según alega la apelante, tal atributo no lo hace incapaz de entender su obligación de decir la verdad. Tal y

como nos señala el profesor Chiesa, la condición o el defecto del testigo sólo tendrá efecto de incapacidad si, con relación al asunto sobre el cual declararía, no puede prestar testimonio inteligible o confiable. E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. I, Cap. VI, pág. 153. En definitiva, el procedimiento correcto fue el seguido por el foro juzgador al permitir el acceso del testimonio al Jurado para que éste, como juzgador de los hechos, determinara la credibilidad que habría de merecerle. *Pueblo v. Millán Meléndez*, 110 D.P.R. 171, 180–181 (1980); *Pueblo v. Mendoza Lozada*, supra, pág. 820.

B. *Segundo señalamiento de error*

El testigo Papo Newman, único testigo del Pueblo que pretende relacionar a la compareciente con los hechos del presente caso, es a todas luces un testigo co-autor o cómplice, cuya declaración se intentó corroborar con un testimonio inconstitucionalmente admisible, violatorio de un debido procedimiento de ley y un juicio justo e imparcial, según se establece en *Lee [v.] Illinois*, Tribunal Supremo de Estados Unidos, 4 de junio de 1986, Vol. 39, No. 10 The Criminal Law Reporter. Alegato de la apelante, pág. 8.

Este segundo señalamiento no merece más consideración que la que le hemos dado al primer señalamiento de error, ya que ambos se fundan en una igual premisa: la alegada necesidad de la presentación de evidencia "corroborativa", habida cuenta de la participación de Newman en calidad de coautor en los eventos delictivos. Por ello, nos remitimos a nuestras expresiones en torno al primer señalamiento.

C. *Tercer y séptimo señalamientos de error*

*TERCER ERROR:* Este Honorable Tribunal cometió grave error de derecho al celebrar juicios conjuntos contra la acusada por diversos hechos y circunstancias que nada tenían que ver con el delito principal ni eran parte de la misma transacción, violentando el derecho de un juicio justo e imparcial y a un debido procedimiento de ley, lo que también infringió la doctrina establecida por el Honorable Tribunal Supremo de Puerto Rico en *Pueblo [v.] Maya Pérez*, 99 DPR 823 (1971). Véase también *Ward [v.] US*, 289 F2d 877 (1961). Alegato de la apelante, pág. 8–9.

*SÉPTIMO ERROR:* Constituyó grave error cometido por este Honorable Tribunal al permitir la continuación del proceso, no obstante haber surgido en el curso del juicio las manifestaciones de un cómplice o coautor en contra de la compareciente, prueba *inadmisible* que invalidó el derecho constitucional de la compareciente a la no autoincriminación, a un juicio justo e imparcial y a un debido procedimiento de ley. En consecuencia, por acto impropio del Ministerio Fiscal se produjo una situación que afectó los derechos constitucionales de la compareciente y su inviolable derecho a un juicio justo e imparcial. (Énfasis en el original suprimido y énfasis suplido.) Íd., pág. 10.

Conviene aquí hacer un paréntesis en la discusión con el fin de exponer con claridad los hechos que eventualmente dan lugar a estos señalamientos. Uno de los testigos más importantes en todo el proceso fue el Sr. William Cartagena Rosa, amigo del apelante López Watts, así como del testigo Newman. Como parte de su testimonio, Cartagena narró la conversación que sostuvo con aquéllos el 12 de enero de 1983, esto es, cinco (5) días antes de los eventos delictivos.[8] A preguntas del Ministerio Público y como parte de su narración —y en presencia del Jurado— Cartagena testificó lo siguiente:

Testigo:

Bien. Cuando estamos hablando, que él me habla de un contrato, yo le pregunto a él si eso tenía que ver con la persona a la cual pertenecía el arma. Si tenía que ver con la persona a la cual pertenecía el arma.

P. ¿Y qua le dijo él?

R. David me contestó que sí. Ahí yo le indiqué que si estaban conscientes de lo que verdaderamente estaban hablando, cometer un asesinato por paga de dinero, eso no, o sea, no, no lo podía cuadrar con ellos. Y me indicó que la Sra. Echevarría lo que quería era no divorciarse de su esposo. Esos fueron los comentarios de Papo.

P. Le pregunto testigo si en esa conversación surgió la perso . . . ., el nombre de la persona que se iba a matar.

R. Sí, señor.

---

[8] T.E. de 3 de abril de 1986, pág. 108 y ss.

P. ¿Quién era?

R. El Sr. Luis Vigoreaux.[9]

A base de este incidente, la apelante sostiene que debió concedérsele un juicio por separado en vista de que se había violado su derecho a la confrontación a la luz de la admisión hecha por López Watts y que la implicaba a ella, y que la misma era igualmente inadmisible puesto que el Ministerio Público denegó esta información, no obstante habérsele requerido en el descubrimiento de prueba. En cuanto a estos aspectos, el alegato del Pueblo hace un exhaustivo análisis en torno al derecho aplicable y a los méritos de los planteamientos de la apelante.[10]

■ La Regla 89 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, gobierna, en términos generales, todo lo relativo a la acumulación de causas. Por su parte, la Regla 90 del mismo cuerpo, 34 L.P.R.A. Ap. II, provee para la celebración de juicios por separado cuando quedare demostrado la existencia de un perjuicio potencial para el acusado o para el Pueblo de ventilarse todos los casos en conjunto.

Encontramos que la Regla 91 de Procedimiento Criminal provee, sin embargo, tratamiento distinto para aquellos casos en que uno de los delitos imputados —o el único— es el de conspiración:

### REGLA 91. JUICIO POR SEPARADO; ADMISIONES POR UN COACUSADO

A solicitud de un coacusado el tribunal ordenará la celebración de un juicio por separado cuando se acusare a varias personas y una de ellas hubiere hecho declaraciones, admisiones o confesiones pertinentes al caso que afectaren adversamente a dicho coacusado, a menos que el fiscal anunciare que no ofrecerá tales declaraciones, admisiones o confesiones como prueba y que tampoco hará, en forma alguna, referencia a las mismas durante el juicio.

*Esta regla no será aplicable a juicios por el delito de conspiración.* (Énfasis suplido.) 34 L.P.R.A. Ap. II.

---

[9] Íd., pág. 118.

[10] Véase alegato del apelado, págs. 27–48.

■ La razón de excluir el juicio por el delito de conspiración de esta regla, que ordena la celebración de juicios por separado en caso de declaraciones, admisiones o confesiones de un coacusado, responde a la arraigada doctrina que se encarna en la Regla 62(E) de Evidencia, 32 L.P.R.A. Ap. IV, de que toda declaración hecha por un coconspirador durante el curso de la conspiración y en la consecución del objetivo de ésta es admisible como excepción a la regla general de exclusión de prueba de referencia. El razonamiento que sustenta la celebración del juicio en conjunto en este tipo de caso es sencillo: dado el hecho de que lo declarado por un coconspirador durante el curso de la conspiración es admisible contra los demás conspiradores, no existe peligro de perjuicio alguno y, por ende, no encuentra justificación la celebración de juicios por separado.

Es por tal motivo que la Regla 92 de Procedimiento Criminal limita el alcance de la regla anterior a declaraciones de conspiradores que ocurran durante el tramite delictivo:

### REGLA 92. JUICIO POR SEPARADO; DELITO DE CONSPIRACIÓN

Cuando fueren acusadas conjuntamente varias personas por el delito de conspiración, el tribunal a solicitud de una de ellas ordenará para ésta la celebración de un juicio por separado si demostrare que alguno de los otros conspiradores, *después de realizado o fracasado el objetivo para el cual se tramó la alegada conspiración*, hizo declaraciones, admisiones o confesiones pertinentes al caso que han de afectar adversamente a la persona que solicitare el juicio por separado, a menos que el fiscal anunciare que no ofrecerá tales declaraciones, admisiones o confesiones como prueba y que tampoco hará, en forma alguna, referencia a las mismas durante el juicio. (Énfasis suplido.) 34 L.P.R.A. Ap. II.

■ En este sentido, la citada Regla 62(E) de Evidencia guarda similar resonancia. Se ha señalado que la aplicación de esta regla posee tres (3) requisitos, a saber:

(1) que la declaración cuya admisión se pretende fue hecha durante la vigencia del tramite delictivo;

(2) que existe prueba independiente de la conspiración y;

(3) que existe igualmente prueba independiente de la conexión del declarante y del acusado con dicha conspiración.[11]

Por nuestra parte, no nos hemos pronunciado sobre si estos dos (2) últimos requisitos, a la luz de la jurisprudencia federal de reciente cuño, son exigibles para la admisión de este tipo de declaración. *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454, 467 esc. 4 (1988).[12] Tampoco es necesario que nos pronunciemos en este caso sobre tales requisitos, ya que la evidencia presentada por el Ministerio Público cumple con los mismos.

██ Pasemos ahora al señalamiento de la apelante en el sentido de que se le infringió el derecho a la confrontación a la luz de *Lee v. Illinois*, 476 U.S. 530 (1986). Concluimos que su planteamiento sobre este particular igualmente carece de méritos. En dicho caso el Tribunal Supremo de Estados Unidos determinó que era inadmisible una declaración de un coautor que incriminaba al otro a base del derecho constitucional a la confrontación y de la trayectoria jurisprudencial precedente.[13] En términos generales, la casuística más reciente en torno a este tema ha seguido las pautas dictadas por *Lee v. Illinois*, supra. *Pueblo v. De Jesús Ayuso*, 119 D.P.R. 21 (1987).

Ahora bien, el dato que hace la diferencia entre la situación ante nuestra consideración y la casuística citada es que esta última no se refiere a situaciones en que esté incluido el delito de *conspiración*, contrario al caso de autos. Aquí el Ministerio Público sostuvo —y el Jurado creyó, a juzgar por el veredicto rendido— la existencia de una conspiración con el fin de cometer asesinato. Como ya hemos visto anteriormente, nuestro ordenamiento, tanto el evidenciario como el procesal, provee un tratamiento particular al presentarse este tipo de acusación. En *Lee v. Illinois*, supra, precisamente se trató de imputar a la allí apelante la comisión de`dos (2) asesinatos a base de que la declaración

---

[11] E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., Vol. I, Cap. VI, pág. 302.

[12] *Bourjaily v. United States*, 483 U.S. 171 (1987).

[13] *Bruton v. United States*, 391 U.S. 123 (1968), es el caso normativo en cuanto a este aspecto.

brindada por el coautor de los hechos intimaba la existencia de una *conspiración,* hecho éste que era tan sólo perceptible en la aludida declaración mas no en el resto de la evidencia desfilada. En ausencia de suficiente evidencia para probar la existencia del trámite delictivo, no procedía la admisión de esa declaración contra la apelante. *Lee v. Illinois,* supra, págs. 546–547.

Examinemos ahora el aspecto relativo al descubrimiento de prueba. La apelante sometió antes del juicio la siguiente solicitud al Ministerio Público, al amparo de la Regla 95 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, para que se le entregase:

> Cualquier declaración, confesión, admisión o declaración exculpatoria escrita u oral dada por la acusada aquí compareciente, o por el coacusado David López Watts y de la cual tenga conocimiento el Ministerio Público, el Secretario de Justicia, o cualquier agente u oficial del Negociado de Investigación Criminal, del Negociado de Investigaciones Especiales o de la Policía de Puerto Rico. . . .[14]

A esta solicitud el Ministerio Público contestó no tener ninguna declaración o confesión de la apelante ni ninguna declaración exculpatoria de ella o de López Watts; guardó silencio con respecto a la existencia de confesión alguna de parte de este último, la cual surgió como parte del testimonio —en pleno juicio— del testigo Cartagena.

■ El derecho al descubrimiento de prueba es consustancial al derecho de todo acusado a defenderse en un proceso criminal en su contra. *Pueblo v. Tribunal Superior,* 102 D.P.R. 470 (1974); *Hoyos Gómez v. Tribunal Superior,* 90 D.P.R. 201, 204 (1964). Por otro lado, la Regla 95 de Procedimiento Criminal, *supra,* establece límites a esta prerrogativa a fin de desalentar las llamadas "expediciones de pesca" en los archivos del Ministerio Fiscal. *Pueblo v. Romero Rodríguez,* 112 D.P.R. 437, 440 (1982); *Pueblo v. Rodríguez Sánchez,* 109 D.P.R. 243, 246–249 (1979). Disponía así dicha regla antes de su derogación:

---

[14] Caso Núm. CR-86-58, Alegato de la apelante, *Exhibit* III, pág. 149.

## INSPECCIÓN DE LIBROS, DOCUMENTOS Y OBJETOS POR EL ACUSADO

Previa moción del acusado sometida en cualquier momento después de haberse presentado la acusación, el tribunal podrá ordenar al fiscal que produzca para ser inspeccionados, copiados o fotografiados por el acusado o su abogado, determinados objetos, libros, documentos y papeles que no fueren declaraciones juradas, con excepción de la declaración del propio acusado, que El Pueblo hubiese obtenido del acusado o de otras personas mediante orden judicial o de otro modo y que pudieren ser necesarios para la preparación de la defensa del acusado, independientemente de que El Pueblo se propusiere ofrecerlos en evidencia o de que los mismos fueren admisibles en evidencia. La orden especificará el tiempo, lugar y manera de hacer la inspección, de sacar las copias o tomar las fotografías y podrá prescribir los términos y condiciones que el tribunal estimare justos. 34 L.P.R.A. Ap. II, ant. R. 95.

Aún asumiendo que la defensa de la apelante tenía derecho a que se le informara de esta declaración, habría que concluir que ello acarrea un error no perjudicial que *por sí solo* no amerita la revocación de las sentencias aquí apeladas. No hemos podido determinar con certeza que esta declaración o admisión consta en los autos del caso. De constar la misma en virtud de una declaración jurada del testigo Cartagena, podría concluirse que la apelante no tenía derecho a la misma, visto el propio lenguaje de la citada Regla 95. *Pueblo v. Rodríguez Aponte,* 116 D.P.R. 653, 660 (1985); *Pueblo v. Colón Rivera,* 93 D.P.R. 852, 855 (1967). Ahora bien, independientemente de lo anterior, cualquier posible error en cuanto a este aspecto quedó finalmente subsanado, toda vez que los abogados de la apelante tuvieron acceso a esta prueba con anterioridad a la celebración del juicio, según surge de la Minuta de 11 de octubre de 1985.[15] Más adelante habremos de ampliar la discusión de este tema.

---

[15] No obstante, resulta de interés apuntar que varios tribunales federales, tanto de distrito como de circuito, han señalado que una lectura amplia de la Regla 16 de Procedimiento Criminal federal —virtualmente idéntica a la Regla 95 de Procedimiento Criminal nuestra, 34 L.P.R.A. Ap. II— lleva a concluir que aquellas declaraciones de coconspiradores hechas durante el transcurso del trámite conspiratorio deben ser consideradas como declaraciones del acusado y, por ende, descubribles. Otros tribunales

### D. *Cuarto y décimoprimer señalamiento de error*

*CUARTO ERROR:* Procede un nuevo juicio, igualmente, por cuanto la publicidad excesiva provocada por el Pueblo de Puerto Rico, por el Ministerio Fiscal y por este mismo Tribunal, violaron el derecho irrenunciable de todo ciudadano a un juicio justo e imparcial y a un debido procedimiento de ley, en violación de los derechos constitucionales de la compareciente, conforme lo establece la Constitución de Estados Unidos y la Constitución de Puerto Rico. (Énfasis suprimido.) Alegato de la apelante, pág. 9.

*DÉCIMO PRIMER ERROR:* La sentencia dictada en el presente caso, además de conculcar el derecho constitucional a un debido procedimiento de ley y a la cláusula prohibitiva de castigos crueles e inusitados, revela el trasfondo de prejuicios que rodeó el enjuiciamiento de la señora Lydia Echevarría Rodríguez, producto de la excesiva publicidad provocada por el interés del Estado y sus funcionarios, antes y durante el juicio, ajena dicha publicidad a los derechos constitucionales irrenunciables de todo ciudadano a un debido procedimiento de ley y a un juicio justo e imparcial. (Énfasis suprimido.) Alegato de la apelante, pág. 12.

La apelante invoca aquí el conflicto entre dos (2) prerrogativas de igual jerarquía constitucional: el derecho de todo acusado a tener un juicio justo e imparcial *versus* el derecho a la libre información y publicación de ideas. En apretada síntesis, el planteamiento de la apelante se reduce a determinar si la amplia exposición de su caso en los medios de comunicación masiva de nuestro país[16] tuvo el efecto de causar un clima de prejuicio en cuanto a los miembros del Jurado, lo cual afectó el resultado del juicio.

El conflicto es uno cuyas raíces se extienden prácticamente a la propia creación de Estados Unidos como república en el siglo XVIII. Los orígenes del conflicto se han trazado, incluso hasta las primeras codificaciones legales inglesas a principios de la Era Moderna. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S.

---

federales han alcanzado el resultado contrario. Véase 2 *Wright, Federal Practice and Procedure: Criminal 2d* Sec. 253 (1982).

[16] Situación lo suficientemente palpable como para que podamos tomar conocimiento judicial de la misma.

555, 564–565 (1980). La casuística proveniente del Tribunal Supremo federal no alcanza contornos claros. No obstante, dicho Foro sí ha procedido a revocar dictámenes condenatorios cuando se establece claramente la ingerencia de factores ajenos al mecanismo decisional que afectan, a su vez, la noción de juicio justo e imparcial que la Constitución federal garantiza a todo acusado. *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Irvin v. Dowd*, 366 U.S. 717 (1961).[17]

La casuística más reciente ha requerido, como parte del proceso que busca conciliar estas prerrogativas, que las circunstancias del caso particular sean tales como para justificar la imposición de medidas tendentes a restringir el margen o radio de acción de los medios informativos en su gestión de cubrir las incidencias del proceso judicial. *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979), opinión del Juez Stewart; *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976). Claro está, el hecho de que la Sexta Enmienda de la Constitución federal garantice al acusado un juicio público no implica, a su vez, garantía irrestricta a un juicio en privado. *Gannett Co. v. DePasquale*, supra, pág. 382. Por ello, se ha reconocido el derecho de los medios noticiosos *a informar lo que acontezca en la vista en su fondo* de un caso criminal, al amparo de las Quinta y Décimocuarta Enmiendas de la Constitución federal. *Richmond Newspapers, Inc. v. Virginia*, supra.[18]

Nuestro acervo jurisprudencial demuestra un grado mayor de consistencia a este respecto. La adjudicación hecha por el juzgador de hechos se encuentra permeada por una presunción de regularidad y corrección, y de que el veredicto se sostiene a base de la prueba desfilada. *Pueblo v. Santiago Acosta*, 121 D.P.R. 727 (1988), y casos allí citados; *Pueblo v. Guzmán Camacho*, 116

---

(17) *Pueblo v. Pérez Santaliz*, 105 D.P.R. 10, 15–16 (1976).

(18) Es de notar que no obstante el carácter normativo del caso *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), el mismo no contiene una opinión mayoritaria del Tribunal Supremo federal, fiel reflejo de la disparidad de criterios que aún permea el conflicto doctrinal al·que ya hemos hecho referencia.

D.P.R. 34, 38 (1984). Por ello recae sobre el que sostiene lo contrario el peso de probar la irregularidad alegada y que la misma afectó sustancialmente el resultado obtenido. *In re Boscio Monllor*, 116 D.P.R. 692, 699 (1985); *Pueblo v. Guzmán Camacho*, supra.

■ La norma general descansa sobre la premisa de que la mera publicación de informaciones noticiosas en torno a un proceso judicial no perjudica por sí sola la garantía constitucional a un juicio justo, recayendo sobre el acusado —como ya indicáramos— demostrar lo contrario. *Pueblo v. Lebrón González*, 113 D.P.R. 81, 86 (1982); *Pueblo v. Chaar Cacho*, 109 D.P.R. 316, 326 (1980); *Pueblo v. Maldonado Dipiní*, 96 D.P.R. 897, 908 (1969). Incluso se ha considerado que no constituye perjuicio la información periodística que reseña la prueba desfilada aun cuando pueda haber alguna incorrección. *Pueblo v. Pérez Santaliz*, 105 D.P.R. 10, 17 (1976).[19]

■ A fin de demostrar el impacto requerido para rebatir la presunción aquí reseñada, el promovente deberá probar la existencia de publicidad parcializada, inflamatoria o tan intensa que de la misma pueda, a su vez, inferirse con razonable certeza una atmósfera de pasión contra el acusado —*Pueblo v. Lebrón González*, supra; *Pueblo v. Pérez Santaliz*, supra, pág. 15— o que justifique el traslado del caso debido a la creación de una atmósfera de prejuicios, odios y pasiones contra dicho acusado o contra el Estado que sostiene la acusación. *Pueblo v. Dumas*, 82 D.P.R. 416, 465 (1961).

■ La clave en este tipo de situación se encuentra en determinar el estado mental que pudo haber imperado en los miembros del Jurado. Por ende, la pregunta a hacerse no es si el público en general conoció o recuerda el caso en particular, sino el hecho de que el Jurado pudo, pese a ello, juzgar imparcialmente al acusado. *Patton v. Yount*, 467 U.S. 1025, 1035 (1984). Se ha

---

[19] *Commonwealth v. Snopek*, 190 A.2d 161 (Penn. 1963).

indicado, como norma general, que un candidato a jurado no debe ser descualificado por el mero hecho de haber leído, visto o estado expuesto de cualquier otra forma a informaciones periodísticas. Debe examinársele en torno a cómo ha sido influido por la información concernida, teniendo siempre en cuenta que su exposición, incluso a publicidad inflamatoria —según sostiene el Tribunal Supremo federal—[20] no descualifica al candidato a jurado a menos que admita haberla creído.[21] M.S. Piñeiro Soler y R. Maldonado Nicolai, *La publicidad y el jurado: ¿problema insoluble, conflicto inevitable?*, 96 Rev. Der. Pur. 453, 457 (1986).

■ Como indicáramos en *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990), lo que debe evitarse es que los miembros del Jurado advengan a juzgar *con una opinión ya formada*. Para prevenir que los jurados que finalmente se escojan tengan esta opinión ya formada, el Tribunal puede tomar las medidas cautelares siguientes:

a. Permitir y llevar a cabo un "voir dire" extenso y riguroso.

b. Otorgar, si fuera necesario, recusaciones perentorias adicionales a las provistas en la Regla 123 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

c. Secuestrar al Jurado.

d. Impartir instrucciones cuidadosas y exhaustivas sobre su responsabilidad de rendir un veredicto fundamentado en la prueba admitida en el juicio y no a base de información obtenida de otras fuentes.

Aplicando todo lo ya discutido al caso de autos, no encontramos méritos en los dos (2) señalamientos de error.

En primer lugar, no percibimos un carácter realmente inflamatorio contra la acusada en los titulares periodísticos señalados por la apelante en su recurso y, menos aún, cómo la cobertura

---

[20] *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976).
[21] Expresamos aquí nuestras reservas con respecto a la implantación en nuestra jurisdicción de este último señalamiento.

noticiosa del caso pudo afectar a los miembros del Jurado en su función juzgadora.

■ En segundo lugar, se tomaron las medidas cautelares pertinentes. No se nos plantea error referente a insuficiencia del "voir dire" ni de recusaciones perentorias, por lo que debemos presumir que el tribunal tomó todas las medidas pertinentes en estos aspectos. Por otro lado, se secuestró efectivamente el Jurado y se le impartieron las correspondientes instrucciones con respecto a la publicidad del caso.[22] Esto es, que se tomaron todas las medidas cautelares pertinentes y no existe prueba de que el Jurado tuviese una opinión formada, por razón alguna, antes de rendir su veredicto. Si a todo lo ya expresado añadimos el dato de que la propia apelante solicitó que la vista preliminar fuese pública[23] y no privada, a lo cual nuestro ordenamiento le da derecho,[24] podemos concluir que su conducta contradictoria en este sentido debilita finalmente cualquier mérito que sus planteamientos pudiesen albergar.

### E. *Quinto y octavo señalamientos de error*

*QUINTO ERROR:* Cometió grave error de derecho este Honorable Tribunal al permitir la continuación de este proceso aun cuando se estableció la ocultación de evidencia por el Ministerio Fiscal, no empece el Ministerio Fiscal haber sido advertido por el Tribunal mediante orden y gestión de la defensa (Regla 95), sobre la necesidad de revelar toda evidencia en su poder a ser utilizada en la vista del caso. Alegato de la apelante, pág. 9.

*OCTAVO ERROR:* El honorable Tribunal de Instancia violó el derecho a un juicio justo e imparcial de la señora Lydia Echevarría Rodríguez al denegar consistentemente mociones sobre disolución del jurado ("Mistrial"), fundadas dichas mociones en hechos y circunstancias propiciados durante el proceso por actuaciones del Ministerio Fiscal tendentes a obtener una convicción de la señora Echevarría Rodríguez, sin consideración al derecho soberano e irrenunciable de todo ciudadano a "un juego limpio", justo e

---

[22] T.E. de 21 de abril a 1ro de mayo de 1986, pág. 54.
[23] Caso Núm. CR-86-58, Alegato de la apelante, *Exhibit* II, pág. 144.
[24] Regla 23(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

imparcial, según garantizado por la Constitución de Puerto Rico y la Constitución de Estados Unidos de América. Alegato de la apelante, págs. 10–11.

La correcta evaluación de estos señalamientos requiere una somera exposición y consideración de los distintos ángulos e incidentes atinentes. En primer lugar, la apelante cuestiona la admisión del testimonio de José A. Pérez Vega, investigador privado, sobre la alegada existencia y el contenido de un contrato suscrito por éste y la apelante con el propósito de que él realizara una investigación sobre la conducta del Sr. Luis Vigoreaux.[25] Sostiene que en este caso debió presentarse el contrato con el fin de probar su contenido.

Trata este asunto en torno a la llamada "Regla de la Mejor Evidencia", consagrada en nuestro ordenamiento por la Regla 69(A) de Evidencia:

*Regla 69. Regla de la mejor evidencia y de la evidencia extrínseca*
(A) A menos que un estatuto o estas reglas dispongan otra cosa, para probar el contenido de un escrito, grabación o fotografía se requiere la presentación del escrito, fotografía o grabación original. 32 L.P.R.A. Ap. IV.

Se ha señalado esta regla como de exclusión, fundamental en el proceso de aquilatar la evidencia ofrecida. Independientemente de ello, pocas reglas encuentran mayor eco al momento de invocar postulados evidenciarios y encontrar apoyo en la adjudicación judicial. 2 *Jones on Evidence* Sec. 7.1, págs. 84–87 (1972). La regla es particularmente invocada cuando se trata de prueba documental. Ahora bien, lo que la regla exige es que cuando se descansa en *el contenido* de un escrito, entonces el mismo debe ser presentado para efectos de constatar dicho contenido; no se requiere cuando se trata de probar la existencia de tal escrito. Chiesa, *op. cit.*, pág. 450.

Notamos que en el caso de autos el testimonio vertido por el testigo Pérez Vega se dirige a probar la existencia de un

---

[25] T.E. de 12 de febrero de 1986, págs. 119–201, y T.E. de 13 de febrero de 1986, págs. 22–78.

contrato y la motivación del mismo, más que a su contenido. Pero es que aun concediendo la aplicación en este caso de la Regla de la Mejor Evidencia, el testimonio de Pérez Vega —a los efectos de que la documentación y el contrato habían desaparecido—[26] sirve al propósito de activar la excepción recogida en la Regla 70(a) de Evidencia, 32 L.P.R.A. Ap. IV, haciendo admisible el testimonio aquí cuestionado cuando el escrito se ha extraviado o destruido. Chiesa, *op. cit.*, págs. 454–455; *Jones on Evidence*, supra, Sec. 7.6, págs. 101–102.

Como siguiente señalamiento, la apelante cuestiona la presentación por parte del Ministerio Fiscal de sólo una parte de los expedientes que el testigo Pérez Vega tenía en su poder y que la presentación de tal documentación sólo es admisible si se presenta con el resto de la documentación relacionada. En cuanto a esto, estimamos correcta la observación del apelado de que la Regla 8 de Evidencia, 32 L.P.R.A. Ap. IV, tan sólo da derecho a la parte contraria a exigir que se presente la totalidad de la documentación que debe ser considerada conjuntamente con la evidencia ofrecida para la mas cabal comprensión de la misma, mas ello no implica que la evidencia de documentación parcial ofrecida por el Ministerio Fiscal advenga inadmisible de por sí. El propósito de la regla es fomentar la presentación simultánea de toda la documentación relacionada y no esperar por la presentación de la documentación restante en un momento posterior. Chiesa, *op. cit.*, pág. 9. El apelado no abunda mucho más en su alegato en torno a este asunto. No obstante, aun cuando considerásemos que el foro juzgador erró de alguna forma, podemos concluir que el error fue *minimi*, sin consecuencia real[27] en cuanto al veredicto emitido.

---

[26] T.E. de 11 y 12 de febrero de 1986, págs. 124–125.

[27] *Pueblo v. Dones Arroyo*, 106 D.P.R. 303, 322–323 (1977), no alberga el alcance extenso que la apelante pretende. El lenguaje del caso y la interpretación que esboza de la llamada "regla de la totalidad" acusa una tonalidad permisiva, más bien que mandatoria, en cuanto a este aspecto.

■ La apelante también imputa al Ministerio Fiscal la ocultación de evidencia exculpatoria al no presentar la declaración jurada del testigo Juan O. Sepúlveda (c/p "Bronco") la cual contenía una versión distinta de los hechos en este caso.[28] "Evidencia exculpatoria" es toda aquella que resulta favorable al acusado y que posee relevancia en cuanto a los aspectos de *culpabilidad y castigo*, irrespectivamente de la buena o mala fe exhibida por el Ministerio Fiscal. *Brady v. Maryland*, 373 U.S. 83, 87–88 (1963); *Moore v. Illinois*, 408 U.S. 786, 794–795 (1972). La "relevancia" de la evidencia se encuentra condicionada a la impresión derivada por el foro apelativo de que la prueba exculpatoria suprimida, con una razonable probabilidad, habría alterado el veredicto o el castigo impuesto de haber sido presentada al juzgador de los hechos. *United States v. Bagley*, 473 U.S. 667, 674–675 (1985); *United States v. Agurs*, 427 U.S. 97, 104 (1976); *U.S. v. Andersson*, 813 F.2d 1450, 1458–1459 (9no Cir. 1987); *United States v. Polizzi*, 801 F.2d 1543, 1553 (9no Cir. 1986).

Notamos, a base de esta discusión, el carácter restrictivo con que la jurisprudencia federal norteamericana trata esta figura. Esto es, no tan sólo se trata de si el fiscal ha ocultado evidencia exculpatoria; la calidad y el peso de la misma es elemento tan o más importante que su propia existencia si tiene suficiente relevancia como para levantar una razonable probabilidad de que el veredicto o la pena pudieran haber sido distintos si se le hubiese considerado. *United States v. Bagley*, supra. Para un estudio de *United States v. Bagley*, supra, y su progenie, véanse: D.J. Capra, *Access to Exculpatory Evidence: Avoiding the Agurs Problems of Prosecutorial Discretion and Retrospective Review*, 53 (Núm. 3) Fordham L. Rev. 391 (1984); Anotación, *Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Conviction*, 34 A.L.R. 3d 16 (1968).

A base de lo ya discutido, encontramos que no se cometió el error ni la transgresión imputada. El tribunal a quo hizo llegar al

---

[28] Esta declaración fue la que originalmente dio fundamento a las primeras denuncias presentadas contra la apelante y que eventualmente resultaron archivadas.

Jurado la declaración debidamente editada a fin de que la "evidencia exculpatoria" favorable al apelante López Watts pasase al Jurado.[29] Pero aun cuando no hubiese sido así, es discutible si dicha evidencia: (a) era realmente exculpatoria y, más aún, (b) si la misma era lo suficientemente relevante como para que razonablemente pueda inferirse un resultado distinto de haberse presentado.

Bajo los señalamientos de error quinto y octavo, la apelante cuestiona también la admisibilidad del testimonio ofrecido por el doctor y perito Roger Fossum a base, primordialmente, de que no había cumplido estrictamente con los requisitos para poder ejercer su profesión en la práctica de la medicina en Puerto Rico. Los "peritos" forman una clase particular de testigos, lo cual motiva que nuestras Reglas de Evidencia les brinden consideración especial y ordenen una evaluación particular de sus testimonios. Regla 51 y ss de Evidencia, 32 L.P.R.A. Ap. IV. No es necesario extenderse mucho más allá. No le asiste la razón a la apelante. La posición del Pueblo es la correcta. "[L]a calificación de un médico como perito no depende del hecho escueto de si posee una licencia para practicar su profesión en determinado lugar, sino más bien de su preparación, entrenamiento y experiencia." *Pueblo v. Rodríguez Otero*, 90 D.P.R. 861, 862 (1964). Según la Regla 53 de Evidencia, 32 L.P.R.A. Ap. IV, no sólo cualifican como "peritos" los expertos y profesionales, sino cualquier persona que a juicio del juez tenga alguna preparación o conocimiento especial de la materia sobre la cual declara. *San Lorenzo Trad., Inc. v. Hernández*, 114 D.P.R. 704, 710–711 (1983). En vista de las credenciales del doctor Fossum, resulta evidente la admisibilidad de su testimonio pericial.[30]

Como último apéndice a estos señalamientos de error, la apelante imputa al Ministerio Fiscal la utilización del testimonio perjuro por vía del testigo Manuel Lecaroz. La casuística federal

---

[29] T.E. de 22 de abril de 1986, pág. 386.
[30] T.E. de 13 de marzo de 1986, págs. 335–340.

es clara en el sentido de que una convicción obtenida a base del testimonio perjuro es esencialmente injusta y debe ser descartada si hay fundamento suficiente para determinar que el falso testimonio pudo haber afectado el veredicto rendido. *United States v. Agurs*, supra, y casos allí citados. Toda convicción obtenida de este modo viola las disposiciones de la Décimocuarta Enmienda de la Constitución federal, ya sea porque el Ministerio Fiscal conozca de la falsedad (*Mooney v. Holohan*, 294 U.S. 103 (1935)) o que el Estado, sin haberlo estimulado, permita su presentación aún conociendo de la incorrección del mismo (*Alcorta v. Texas*, 355 U.S. 28 (1957)). Véase, también, *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Avistado el panorama, podemos comprobar que el hecho imputado al Ministerio Fiscal tampoco fue cometido. El alegado "testimonio perjuro" del testigo Lecaroz no pasó al Jurado como resultado del interrogatorio directo a que fuera sometido, sino a base del contrainterrogatorio desarrollado por la defensa. El Jurado recibió el testimonio —presuntamente verídico— y advino en conocimiento de que Lecaroz había mentido en la investigación original del caso, a instancias de las fiscales que realizaron esa investigación.[31]

### F. *Sexto señalamiento de error*

Procede también la revocación de la sentencia cuando el veredicto de absolución [del] co-acusado López Watts es jurídicamente irreconciliable con el veredicto de culpabilidada (sic) de la compareciente, cuando las pruebas ofrecidas al Jurado son producto del testimonio único e indivisible del testigo Papo Newma[n.] La duda razonable del Jurado sobre el testimonio de Papo Newma[n,] permitió absolver al acusado López Watts y esa misma duda razonable, no obstante, contrario a la ley, produjo un veredicto de culpabilidad contra la compareciente. A todas luces se trata de un veredicto contrario a

---

[31] Véase el incidente en T.E. de 19 de febrero de 1986, págs. 460–465. Este incidente surge como resultado de que, presuntamente, estas funcionarias indujeron a Lecaroz a testificar, con el fin de darle "mayor impacto" a su declaración, que la apelante le había indicado que necesitaba a alguien para que "liquida[se]" a Vigoreaux (versión falsa), en vez de "darle una pela", que, según él, fue lo que en realidad le dijo la apelante.

derecho, irracional y prejuiciado contra la compareciente. Por analogía, véase *Pueblo [v.] León*, 67 D.P.R. 557 (1947). Alegato de la apelante, págs. 9–10.

█ En síntesis, este señalamiento de error plantea que el veredicto rendido por el Jurado contra la apelante Echevarría Rodríguez es contrario a Derecho, toda vez que el mismo es irreconciliable con el veredicto del coacusado y apelante López Watts. Como señalamos anteriormente, el panel de jurados absolvió a López Watts del delito de asesinato en primer grado, mientras que encontró culpable de este delito a la apelante Echevarría Rodríguez.[32] Argumenta la apelante que la duda razonable que pudo tener el Jurado para decidir absolver a López Watts —luego de escuchar el testimonio del testigo Papo Newman— tuvo que existir también respecto a la culpabilidad de ella.[33] Entiende la apelante Echevarría Rodríguez que el fundamento que tuvo el Jurado para emitir su veredicto fue el testimonio "único e inadmisible" del señor Newman, por lo cual el veredicto rendido por el Jurado de forma tan inconsistente[34] acusa la existencia de prejuicio contra ella. Arguye, además, que el ánimo prejuiciado del Jurado no permitió la consideración imparcial de la evidencia aportada por el Pueblo.[35]

---

[32] El Ministerio Público presentó ante el Jurado evidencia con el fin de probar que la apelante Lydia Echevarría Rodríguez y el apelante López Watts conspiraron para dar muerte al Sr. Luis Vigoreaux. Si al Jurado le mereció credibilidad la prueba de conspiración para cometer asesinato, lo lógico sería que ambos resultaran convictos de ese delito, ya que según los Arts. 34 y 35 del Código Penal, 33 L.P.R.A. secs. 3131 y 3172, el autor intelectual que conspira con el autor material en la comisión de un delito responde como autor principal.

[33] En casos de coacusados juzgados conjuntamente por la comisión de un mismo delito, se entiende que un "veredicto inconsistente" es aquel que carece de compatibilidad racional con otros veredictos obtenidos. Anotación, *Inconsistency of Criminal Verdicts as Between Two or More Defendants Tried Together*, 22 A.L.R. 3d 717 (1967).

[34] Entiende la apelante que contra el coacusado López Watts se presentó prueba a través del testimonio del señor Newman, que de ser creída, sería robusta y convincente para demostrar la participación directa de aquél en el asesinato; mientras que contra ella, la prueba se circunscribió a alegadas manifestaciones hechas por ella para contratar la muerte de su marido.

[35] En el escrito de apelación no existe alegación ni argumentación alguna en el sentido de que la razón para el veredicto inconsistente fuera alguna instrucción errónea al Jurado. Si el veredicto inconsistente hubiese sido consecuencia de una instrucción

Por su parte, el Procurador General afirma en su alegato que el argumento de que la única prueba que recibió el Jurado en contra de la apelante fue el testimonio del testigo bajo inmunidad es falaz, ya que se presentó prueba circunstancial adicional contra ésta —móvil del crimen, gestiones para realizarlo— que no vinculaba directamente a López Watts. Discute, además, la procedencia de los veredictos inconsistentes.

La opción de un juicio ante un panel de jurados implica conferir a éstos la administración de la justicia, esto es, la determinación final sobre culpabilidad o no culpabilidad. El Jurado, compuesto por una muestra representativa de la comunidad del acusado, tiene como encomienda evaluar la prueba, recibir instrucciones sobre el derecho aplicable, deliberar en secreto y rendir un veredicto final. De entender el Jurado que el acusado incurrió en responsabilidad criminal por los hechos que se le imputan, deberá determinar el delito específico o el grado del mismo por el cual éste deberá responderle a la sociedad. *Pueblo v. Cruz Correa,*, 121 D.P.R. 270 (1988). En ocasiones, durante el proceso de deliberación, estos jurados, pares del acusado, legos en materia de derecho, "atemperan la ley a su propio sentido de justicia y así atemperada la aplican". *Pueblo v. Medina Ocasio*, 98 D.P.R. 302, 305 (1970). Véase *Pueblo v. Landmark*, 100 D.P.R. 73, 78 (1971). En *Pueblo v. Laboy*, 110 D.P.R. 164, 167 (1980), parafraseando jurisprudencia federal[36] señalamos: "'[e]l propósito de un jurado es precaver el ejercicio arbitrario —proporcionar el sentido común de la comunidad como protección frente al fiscal apasionado o errado y en preferencia a la reacción profesional o tal vez demasiado condicionada o prejuiciada del juez.'" Por esta razón, muchas veces el Jurado emite veredictos que nos parecen incongruentes, ilógicos. No obstante, a pesar de lo inconsistentes que nos parezcan y del afán que podamos sentir por tener una explicación de la razón de los veredictos emitidos, el

---

erróneamente impartida, constituiría un error que ameritaría la revocación de la sentencia. *Pueblo v. Landmark*, 100 D.P.R. 73 (1971).

[36] *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).

proceso de razonamiento individual o colectivo del Jurado no puede ser develado, ya que tal intromisión acarrearía la desaparición de la franqueza y libertad de discusión.[37]

■ La deferencia que se le ha otorgado al proceso de deliberación y posterior veredicto por miembros de la comunidad es evidente. Nuestro ordenamiento procesal penal ha previsto la ocurrencia de veredictos irregulares y ha dispuesto lo siguiente:

> Si al rendirse un veredicto de culpabilidad el tribunal considerare que el jurado se ha equivocado en la aplicación de la ley, el juez que lo presida podrá explicar al jurado sus razones y ordenarle que vuelva a considerar el veredicto. Si después de esto se rindiere el mismo veredicto, éste será aceptado por el tribunal. Nada de lo aquí dispuesto será aplicable a un veredicto absolutorio el cual deberá ser aceptado siempre por el tribunal. Regla 148 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.
>
> Si el veredicto fuere tan defectuoso que el tribunal no pudiere determinar la intención del jurado de absolver o condenar al acusado por el delito bajo el cual el acusado pudiera ser convicto de acuerdo con la acusación, o no pudiere determinar en qué cargo o cargos el jurado quiso absolver o condenar al acusado, el tribunal podrá instruir al jurado para que reconsidere dicho veredicto y exprese claramente su intención. Pero si el jurado persistiere en rendir el veredicto defectuoso, *tal veredicto será aceptado y el tribunal dictará un fallo absolutorio.* (Énfasis suplido.) Regla 149 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

■ Por su parte, nuestra jurisprudencia sobre veredictos inconsistentes se ha reafirmado en cuanto a que no es necesario demostrar consistencia lógica entre los mismos. *Pueblo v. Cabán Torres,* supra; *Pueblo v. Cortés Calero,* 99 D.P.R. 679 (1971). Recientemente este Tribunal ha reafirmado que "la norma imperante en nuestra jurisdicción es a los efectos de que el hecho de que un jurado —olvidándose indebidamente del derecho trasmitídole en las instrucciones y, quizás, inspirado por un excesivo sentido de clemencia— se incline a favorecer a un

---

[37] Véanse: Regla 42(C) de Evidencia, 32 L.P.R.A. Ap. IV; *Pueblo v. Figueroa Rosa,* 112 D.P.R. 154 (1982); *McDonald v. Pless,* 238 U.S. 264 (1915).

imputado de delito [menor] en cuanto a [unos] cargos, rindiendo veredictos de culpabilidad por un delito menor incluido, o de inocencia, no conlleva la nulidad del veredicto rendido por el delito mayor ni la reducción de éste al nivel de los demas". *Pueblo v. Gómez Nazario*, 121 D.P.R. 66, 75 (1988). *Cf. Pueblo v. Negrón Vélez*, 96 D.P.R. 419 (1968). [38]

La consistencia lógica de los veredictos del Jurado tampoco es requisito indispensable en la jurisdicción federal:

> In the federal courts, it is not necessary that the verdict returned by a jury be logically consistent in all respects. One type of situation is that in which there is inconsistency regarding separate counts against a single defendant, as in *Dunn v. United States*. 3 *LaFave and Israel, Criminal Procedure* Sec. 23.7, pág. 48 (1984). [39]

En *Dunn v. United States*, 284 U.S. 390, 393 (1932), caso de varios cargos contra un acusado, el Tribunal Supremo federal razonó:

> Each count in an indictment is regarded as if it was a separate indictment. If separate indictments had been presented against the defendant . . . and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as *res judicata* of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold.

A tenor con este principio generalizado sobre la admisibilidad de veredictos inconsistentes, en la mayor parte de los tribunales federales existe consenso al efecto de que en casos de coacusados juzgados conjuntamente tampoco es obligatoria la consistencia de los veredictos. [40]

---

[38] Sobre fallos inconsistentes en tribunal de derecho, véase *Pueblo v. Acabá Raíces*, 118 D.P.R. 369 (1987).

[39] Véanse, además: *United States v. Powell*, 469 U.S. 57 (1984); *Harris v. Rivera*, 454 U.S. 339, 346 (1981); *Standefer v. United States*, 447 U.S. 10 (1980); Anotación, *supra*.

[40] *United States v. Crooks*, 766 F.2d 7 (1er Cir. 1985); *United States v. Young Bros., Inc.*, 728 F.2d 682 (5to Cir. 1984); *United States v. Parodi*, 703 F.2d 768 (4to Cir. 1983); *United States v. Martorano*, 557 F.2d 1 (1er Cir. 1977); *United States v. Anderson*, 509 F.2d

Aunque existe casuística federal que ha discutido la improcedencia de veredictos inconsistentes en casos de acusados enjuiciados en el mismo proceso, aun en esos casos se ha dicho que para que proceda la revocación por inconsistencia los veredictos tienen que haberse fundamentado en evidencia idéntica en cuanto a todos los coacusados. En un caso del siglo pasado se expresó, sobre el particular, lo siguiente:

Of course, as a matter of pleading, two may be jointly indicted for the same offense, whether the offense be in its nature joint or not; and, on a joint trial before a jury, where the offense is not in its nature joint, one may be convicted and the other acquitted, or one may be convicted and the jury disagree as to the other, provided the evidence warrants the difference in the results. *But where there is but one witness, and his testimony equally affects both, it is simply impossible that a different result can be legally reached as to the two.* (Énfasis suplido.) *Davis v. State,* 23 So. 770 (Miss. 1898).

No obstante, este caso fue revocado en 1975 en *Newell v. State,* 308 So. 2d 68, 70 (1975), para acogerse a la doctrina que permite los veredictos inconsistentes. En este caso se juzgó conjuntamente a dos (2) coacusados del delito de violación. El único testimonio fue el de la víctima. El tribunal razonó:

If the defendants Newell and McCormick had been tried separately on the same indictment and the testimony had been identical in both cases, and acquittal of one would not affect a verdict of guilty as to the other. The rule should be the same when they are tried together. *Newell v. State,* supra, pág. 70.

La emisión de veredictos inconsistentes también ha sido favorecida por tratadistas:

---

312 (D.C. Cir. 1974). La regla de *Dunn v. United States,* 284 U.S. 390 (1932), se aplicó en *United States v. Dotterweich,* 320 U.S. 277, 279 (1943), un caso de inconsistencia de veredictos con relación a más de un acusado: contra una corporación y contra su presidente. El Jurado exoneró la corporación pero encontró culpable al presidente. Sostuvo el Tribunal:

"Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial. Juries may indulge in precisely such motives or vagaries." *United States v. Dotterweich,* supra, pág. 279.

. . . [I]t has been argued that "an enlightened jurisprudence should not thus permit the jailing of accused persons on a record exhibiting verdicts in which a jury simultaneously says 'yes' and 'no' in answer to a single critical question." But it is better to have such inconsistency than to try to forbid it. It is well to remember that the "true rationale for the rule permitting inconsistent verdicts in a single trial is that a jury may convict on some counts but not on others, not because they are unconvinced of guilt, but because of compassion or compromise." The exercise of such leniency, which is an aspect of the right to jury trial, is preferable to a system in which jurors, whenever they believed the defendant guilty, "would be strong-armed into rendering an all-or-nothing verdict." (Notas omitidas.) *LaFave and Israel*, supra, pág. 49.

Es menester concluir que la doctrina y la línea jurisprudencial sobre veredictos inconsistentes no favorece la contención de la apelante Echevarría Rodríguez. Aunque ésta alega que el veredicto no estuvo fundamentado en un sentimiento de indulgencia por parte del Jurado hacia el coacusado López Watts, sino que fue consecuencia de error o parcialidad por parte del Jurado, ella no ha rebatido la presunción de que los jurados siguen las instrucciones impartidas y de que su función de juzgadores se ha descargado conforme a derecho y estuvo desprovista de todo prejuicio. Además, cualquier argumento que pudiera esgrimir sería completamente especulativo, toda vez que no se tiene acceso al proceso de deliberación. Sobre este particular, el Tribunal Supremo federal ha señalado:

We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake. Jurors, of course, take an oath to follow the law as charged, and they are expected to follow it. *United States v. Powell*, 469 U.S. 57, 66 (1984). *Cf. Richardson v. Marsh*, 481 U.S. 200 (1987).

El error no fue cometido.

## G. *Noveno señalamiento de error*

Cometió gravísimo error de derecho el Honorable Tribunal de Instancia al impartir instruccione[s i]nsuficientes y equívocas al Jurad[o s]obre el fundamental derecho constitucional de los comparecientes a su silencio y autoincriminación, derecho ampliamente protegido por la Constitución de Puerto Rico y la Constitución de los (sic) Estados Unidos de América. Igual insuficien[cia] en cuanto a las instrucciones sobre cómplice y coautor, y el efecto probatorio de toda declaración al respecto. Alegato de la apelante, pág. 11.

En todo juicio celebrado ante un panel de jurados, el tribunal deberá impartir instrucciones haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho necesarias para la información del mismo. Regla 137 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; *Pueblo v. Cruz Correa,* supra. En este procedimiento de ilustración, los tribunales tienen la ineludible responsabilidad de velar por que sus instrucciones sean correctas, claras, precisas y lógicas. *Pueblo v. Ortiz Martínez,* 116 D.P.R. 139 (1984); *Pueblo v. Landmark,* supra. A los fines de hacer viable esta tarea judicial se ha confeccionado, y este Tribunal ha aprobado, un manual de instrucciones al Jurado[41] con el propósito primordial de adoptar un método uniforme de instrucción que ayude en la consecución de los objetivos siguientes: (1) alcanzar un mayor grado de certeza y estabilidad en los procedimientos criminales; (2) acelerar los trámites judiciales; (3) lograr una mayor claridad y comprensión de las instrucciones por parte de los jurados, y (4) eliminar el lenguaje parcializado o argumentativo en las instrucciones.[42]

---

[41] Conferencia Judicial de Puerto Rico, *Instrucciones al Jurado para el Tribunal Superior de Puerto Rico,* 2da ed., San Juan, Ed. C. Abo. P.R., 1977. Este informe recibió endoso y aprobación de este Tribunal mediante resolución emitida el 7 de mayo de 1976 (104 D.P.R. 1067 (1976)). Posteriormente, fue enmendado y aprobado mediante Resolución de 27 de marzo de 1980.

[42] *Instrucciones al Jurado para el Tribunal Superior de Puerto Rico, op. cit.,* pág. iv.

■■■■■ Aunque la utilización del libro de instrucciones es discrecional,[43] reiteradamente hemos señalado que constituye una buena práctica en aras de disminuir las posibilidades de error en las instrucciones al Jurado y de lograr una mayor uniformidad[44] en la administración de la justicia criminal. *Pueblo v. Mattei Torres*, supra; *Pueblo v. Mangual Hernández*, 111 D.P.R. 136 (1981); *Pueblo v. Ortiz González*, 111 D.P.R. 408, 410 (1981); *Pueblo v. Velázquez Caraballo*, 110 D.P.R. 369 (1980). Como incentivo para lograr el uso generalizado de estas instrucciones modelos en los foros de instancia, las instrucciones que son impartidas según disponen las contenidas en el referido manual estarán cobijadas por una presunción de corrección.[45] *Pueblo v. Mattei Torres*, supra; *Pueblo v. Jiménez Hernández*, 116 D.P.R. 632 (1985). Así pues, quien las impugne deberá demostrar *afirmativamente* que la instrucción es errónea. *Pueblo v. Ortiz González*, supra, pág. 410. En el caso ante nuestra consideración, el foro juzgador adoptó e impartió las instrucciones contenidas en el manual.

En la discusión de este señalamiento de error se mencionan específicamente las instrucciones siguientes, que a juicio de la apelante fueron incorrectas por no ilustrar adecuadamente al Jurado:

1. *Instrucción sobre evidencia circunstancial: inferencias*

Instruyó la juez:

La evidencia circunstancial o indirecta es aquella que prueba un hecho del cual surge una inferencia de la existencia del otro. Esto es, con la evidencia circunstancial se prueba un hecho del cual se infieren otros.

Una inferencia es una deducción de hecho que surge lógica y razonablemente . . . que estén justificadas a base de su propia experiencia y que surjan de los hechos *que ustedes consideren o*

---

[43] Véase la resolución de este Tribunal de 7 de mayo de 1976, *supra.*
[44] En *Pueblo v. Mangual Hernández*, 111 D.P.R. 136, 146 (1981), señalamos que la falta de uniformidad puede resultar injusta para algunos acusados.
[45] Véase la resolución de este Tribunal de 7 de mayo de 1976, *supra.*

*estimen probados.* (Énfasis suplido.) T.E. de 21 abril a 1ro de mayo de 1986, págs. 541–542.

La defensa de la apelante Echevarría Rodríguez objetó esta instrucción porque "ahí no se le instruye al Jurado que lo que le está permitido a ellos hacer son inferencias lógicas de la prueba que escucha[n ya que uno puede hacer] inferencias ilógicas". T.E. de 21 de abril a 1ro de mayo de 1986, pág. 577. No hay argumentación adicional.

▮ El planteamiento de la apelante carece de méritos. En esa misma instrucción, al explicarse lo que es una "inferencia", se define como una deducción de hecho que surge *lógica* y *razonablemente,* "que estén justificadas a base de su propia experiencia y que surjan de los hechos que ustedes consideren o estimen probados". T.E. de 21 de abril a 1ro de mayo de 1986, pág. 542. No creemos necesario mayor explicación. Para determinar la corrección o incorrección de las instrucciones hay que considerarlas en su totalidad y no por frases aisladas. *Pueblo v. Domenech Meléndez,* 98 D.P.R. 64 (1969); *Pueblo v. Díaz Alicea,* 91 D.P.R. 786 (1965); *Pueblo v. Barriera González,* 89 D.P.R. 772 (1964). La instrucción fue correctamente impartida.

La apelante cita el caso *Sandstrom v. Montana,* 442 U.S. 510 (1979), y discute en un par de oraciones la norma de éste sobre el peligro de que el Jurado entienda la instrucción de que la ley presume que una persona intenta las consecuencias ordinarias de sus actos como una presunción concluyente. Entiende la señora Echevarría Rodríguez que el Jurado pudo tomar su decisión a base de la presunción y no de la evidencia ofrecida.

Una simple lectura de las instrucciones impartidas revela que en todo momento la juez de instancia se refirió a "deducciones" e "inferencias" y *no* a presunciones. Las instrucciones impartidas superan la dificultad del caso *Sandstrom v. Montana,* supra, y son afines con lo resuelto por este Tribunal en *Pueblo v. Torres Montañez,* 106 D.P.R. 125, 129–130 (1977). El planteamiento sobre estas instrucciones es inmeritorio.

## 2. *Instrucción sobre reputación*

La instrucción impartida sobre reputación aparece incluida en el manual de instrucciones al Jurado y la misma está acorde con las directrices de este Tribunal en *Pueblo v. Negrón Vélez*, supra. Se instruyó:

La acusada Doña Lydia Echevarría Rodríguez ha presentado prueba de su buena reputación en el grupo donde normalmente se desenvuelve. El propósito de la prueba de buena reputación es la de crear duda razonable. Esta prueba considerada conjuntamente con el resto de la prueba presentada puede crear una duda razonable, porque el Jurado puede entender, si su criterio así se lo aconseja, que es improbable que una persona de buena reputación pueda cometer un delito como el que se le imputa a la acusada. Por tanto, al resolver sobre la culpabilidad o inocencia de la acusada, el Jurado deberá considerar dicha prueba de buena reputación conjuntamente con la otra prueba presentada, sin importar que el efecto de dicha otra prueba sea claro o dudoso.

Si luego del Jurado considerar la prueba de buena reputación, conjuntamente con el resto de la prueba, se convencen fuera de toda duda razonable, que la acusada es culpable del delito imputádole, deben declararla culpable no obstante el hecho de que sea una persona buena, de buena reputación. '

Sin embargo, si después de considerar toda la prueba en la forma apuntada, esto es, la prueba de buena reputación conjuntamente con el resto de la prueba, surge duda razonable sobre la culpabilidad de la acusada, deben absolverla. T.E. de 21 de abril a 1ro de mayo de 1986, pág. 550.

No comprendemos la impugnación que se hace en cuanto a esa instrucción. No podemos determinar qué deficiencia encuentra la apelante en la misma.

## 3. *Instrucción sobre evidencia demostrativa*

La Juez instruyó:

En este caso les fueron mostrados a ustedes, un tenedor con cabo de madera, un tenedor de barbacoa con cabo de madera color marrón, una pistola High Standard, calibre 22, serie 2356960 con dos peines; una pistola marca "Back-up" calibre 380, serie A08472 stainles[s]

steel; un punzón con cabo de madera marrón; un tenedor con cabo negro y un galón plástico blanco. En relación con dicha prueba se les instruye, que dichos tenedores, punzón, armas de fuego y galón blanco, deberán considerarlas ustedes [ú]nicamente como evidencia demostrativa. T.E. de 21 abril a 1ro de mayo de 1986, pág. 552.

Se queja la apelante de qué no se explicó qué es "evidencia demostrativa" ni cuál es el valor probatorio de la misma. No se planteó objeción alguna ni se solicitó instrucción especial sobre este particular en el tribunal de instancia.[46]

La Regla 137 de Procedimiento Criminal, *supra*, en lo pertinente, dispone que ninguna "de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud".[47] Esta exigencia tiene como objetivo brindarle al foro juzgador la oportunidad de corregir los errores que pueda haber cometido. *Pueblo v. Ortiz Martínez*, supra, pág. 151. No obstante, si la instrucción tuviera el efecto de lesionar derechos fundamentales del acusado, puede levantarse como error en apelación a pesar de no haberla objetado oportunamente. *Pueblo v. Ortiz Martínez*, supra; *Pueblo v. Rivera Carmona*, 108 D.P.R. 866 (1979).

En esta instrucción, la apelante Echevarría Rodríguez se limita a impugnar el vocablo "evidencia demostrativa", el cual fue adoptado por las Reglas de Evidencia de esta jurisdicción y de la federal, y por la jurisprudencia.[48] No se elabora plantea-

---

[46] El único planteamiento en instancia relacionado con la "evidencia demostrativa" fue, particularmente, sobre la ausencia de instrucción respecto a unas fotografías que llevó consigo el Jurado, lo cual no se discute ni plantea ante nos. Más adelante discutiremos sobre la admisión de las fotografías.

[47] En ausencia de objeción a las instrucciones impartidas, deberá presumirse la corrección jurídica de las mismas. *Pueblo v. Jiménez Hernández*, 116 D.P.R. 632, 638 (1985).

[48] En los comentarios a la Regla 80 de Evidencia, 32 L.P.R.A. Ap. IV, se define el término "evidencia demostrativa" como "aquella evidencia que aprehende el juzgador directamente a través de la percepción de los sentidos, particularmente a través de la vista". Véanse, además: E.W. Cleary, *McCormick on Evidence*, 3ra ed., Minnesota, Ed.

miento alguno en cuanto al problema que pudo haber causado el que no se ofreciera una definición o el que este tipo de evidencia (por su naturaleza) pudo haber causado.[49]

La ausencia de definición del término "evidencia demostrativa" no lesionó derecho fundamental alguno de la apelante.

Las siguientes impugnaciones a las instrucciones se limitan a copiar la objeción planteada ante el tribunal de instancia sin fundamentar ni discutir en forma alguna la improcedencia o incorrección de éstas. Carecen de méritos.

### H. *Décimo señalamiento de error*

El Honorable Tribunal de Instancia incidió en grave e irreversible error de derecho al resolver innumerables planteamientos evidenciarios, de naturaleza crucial, enmarcados claramente en nuestra Ley de Evidencia, siendo sus resoluciones diametralmente opuesta[s] a nuestra jurisprudencia y a la Ley de Evidencia, la que configura importantes aspectos sobre la garantía constitucional de un debido procedimiento de ley y un juicio justo. Al efecto se señala, entre otras resoluciones, las siguientes: 1) admitir pruebas sin previamente establecerse "la cadena de evidencia"; 2) admisión de fotografías innecesarias presentadas por El Pueblo sin otro propósito que no fuese inflamar el ánimo del jurado; 3) admisión infundada del testimonio del [Dr.] Roger Fossum ; 4) denegación de evidencia apropiada y pertinente ofrecida por la defensa, consistente en fotografías relacionadas con el testigo principal de El

---

West Publishing Co., 1984, T. 8, Cap. 21, Sec. 212, págs. 663–669; *Pueblo v. Bianchi Álvarez*, 117 D.P.R. 484 (1986).

[49] El profesor Chiesa en sus anotaciones sobre "evidencia demostrativa" y "científica" (Regla 80 de Evidencia, *supra*) discute que la "evidencia demostrativa" puede ser objeto de división o clasificación. Puede ser, primero, directa o indirecta (circunstancial) y, segundo, real o ilustrativa. Explica que si la evidencia se presenta para que el juzgador *vea* la existencia de una calidad en un objeto, es "evidencia demostrativa directa." No obstante, si el objeto se trae para que el juzgador realice inferencias de la observación, es circunstancial. Por otra parte, si el objeto juega un papel central y directo en el caso (ej.: el arma usada en un homicidio) constituye evidencia real. Ahora, si el objeto es traído meramente para ilustrar o hacer otra evidencia más inteligible (ej.: drogas, mapas, fotografías) la evidencia es ilustrativa. Según el comentarista, la importancia de estas distinciones consiste en que cuando se trata de evidencia real, de ordinario requiere —previo a su admisión— una determinación preliminar bajo la Regla 9 de Evidencia, 32 L.P.R.A. Ap. IV, y un procedimiento de autenticación bajo la Regla 75 (32 L.P.R.A. Ap. IV), mientras que en caso de evidencia ilustrativa, queda a la sana discreción del tribunal el admitirlo. E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. I, pág. 512.

Pueblo, Papo Newma[n,] que servirían el propósito de impugnar la veracidad de dicho testigo, así como; 5) la comisión de otros errores análogos.

La actuación errónea del Tribunal al efecto maculó y vició el proceso, en violación al derecho de la señora Echevarría Rodríguez a un juicio justo e imparcial y a un debido procedimiento de ley, según lo establece nuestra Constitución y la Constitución de Estados Unidos de América. Alegato de la apelante, págs. 11–12.

En la discusión de este señalamiento de error se repiten señalamientos anteriores, los cuales ya hemos discutido: Regla de la Mejor Evidencia y el testimonio del testigo José A. Pérez Vega (págs. 332–333); admisión del testimonio del doctor Fossum (págs. 334–335); ocultación de prueba exculpatoria (pág. 334). Nos resta discutir los señalamientos siguientes:

*Cadena de evidencia; cadena de custodia*

En este apartado la apelante discute la admisión en evidencia del envase plástico o galón que alegadamente contenía la gasolina con la cual quemaron el automóvil del Sr. Luis Vigoreaux. Sostiene la apelante que el envase fue admitido sin que pudieran precisarse las marcas (*tags*) de identificación original, lo cual afectaría por completo la cadena de evidencia. En otras palabras, entiende la apelante que todo el procedimiento de la cadena de evidencia quedó viciado desde el principio por no haberse identificado apropiadamente el envase de gasolina.

La Regla 75 de Evidencia, 32 L.P.R.A. Ap. IV, sobre autenticación e identificación de evidencia, establece que "[e]l requisito de autenticación o identificación como una condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestiones lo que el proponente sostiene".

Por otra parte, la Regla 10(C) de Evidencia, 32 L.P.R.A. Ap. IV, señala que "[p]ara establecer un hecho [en cuestión] no se exige aquel [grado] de prueba que, excluyendo posibilidad de error, produzca absoluta certeza; sólo se exige la certeza o convicción moral en un ánimo no prevenido". Así pues, la

admisibilidad de evidencia demostrativa estará sujeta a que el proponente, haciendo uso de cualquier evidencia admisible, demuestre con el grado de certeza requerido que la evidencia ofrecida es justamente lo que alega que es.[50]

En *Pueblo v. Bianchi Álvarez*, 117 D.P.R. 484 (1986), este Tribunal señaló que la llamada "cadena de evidencia" no era otra cosa que una serie de precauciones para *fortalecer* la identificación de evidencia física y la confiabilidad de la prueba obtenida. En otras palabras, es un modo de establecer fehacientemente la integridad de la evidencia propuesta mediante un enlace consecutivo de eventos en la custodia de un objeto desde su ocupación hasta la presentación del mismo en el pleito.[51] Subsiguientemente, en *Pueblo v. Carrasquillo Morales*, 123 D.P.R. 690 (1989), tuvimos ocasión de ocuparnos de problemas particulares que surjen para establecer la cadena de custodia en algunos casos, tales como: objetos que contienen materia fungible cuyo contenido se ofrece en evidencia; objetos no distinguibles de objetos similares; objetos susceptibles a fácil alteración, etc.

La cadena de evidencia puede ser condición suficiente pero no necesaria para satisfacer el principio general establecido por la regla de autenticidad. *United States v. Georgalis*, 631 F.2d 1199, 1205–1206 (5to Cir. 1981); Chiesa, *op. cit.* Así pues, si el proponente de la evidencia logra satisfacer las exigencias de autenticación, ya sea por cadena de custodia o por testimonio de identificación, habrá superado la barrera que le dejaba en suspenso la admisibilidad. Una vez el juzgador decida

---

[50] La autenticidad de evidencia no implica su admisibilidad, pues podría existir alguna regla de exclusión.

[51] Nuestra Regla 75 de Evidencia, *supra*, es prácticamente idéntica a la regla federal sobre autenticación. La jurisprudencia federal considera que la cadena de custodia es un mecanismo para demostrar que el objeto ofrecido en evidencia es lo que se reclama: "This can be accomplished by showing a 'chain of custody,' which indirectly establishes the identity and integrity of the evidence by tracing its continuous whereabouts." *United States v. Zink*, 612 F.2d 511, 514 (10mo Cir. 1980). Véanse, además: *United States v. Lepanto*, 817 F.2d 1463 (10mo Cir. 1987); *United States v. Mendel*, 746 F.2d 155, 156 (2do Cir. 1984); *United States v. Howard-Arias*, 679 F.2d 363, 366 (4to Cir. 1982); *United States v. Phillips*, 640 F.2d 87 (7mo Cir. 1981); *United States v. Avilés*, 623 F.2d 1192 (7mo Cir. 1980); *United States v. López*, 758 F.2d 1517 (11mo Cir. 1985).

admitir la evidencia, por estimar que se presentó prueba suficiente para autenticar el objeto, tal determinación no deberá ser alterada en apelación a no ser por un claro abuso de discreción. *United States v. Zink*, 612 F.2d 511 (10mo Cir. 1980). Admitida la evidencia correspondiente por el tribunal, corresponderá entonces al Jurado sopesar el valor probatorio de la cadena de custodia presentada. La cuestión de si el proponente de la evidencia ha probado una adecuada cadena de custodia se dirige al peso, mejor que a la admisibilidad de la evidencia, y queda por tal reservada para el Jurado. *Pueblo v. Bianchi Álvarez*, supra; *United States v. Henderson*, 588 F.2d 157, 160 (5to Cir.), *cert.* denegado, 440 U.S. 975 (1979); *United States v. White*, 569 F.2d 263, 266 (5to Cir.), *cert.* denegado, 439 U.S. 848 (1979).

En el caso de autos, el Ministerio Público presentó nueve (9) personas que testificaron sobre los eventos relacionados con la custodia del galón con residuos de gasolina desde el momento en que se ocupó el mismo y señalaron las características particulares que les permitían identificarlo. Además, a través de los testimonios de la testigo Marylin Cintrón —amiga del coacusado López Watts— y el testimonio del señor Newman, se presentó prueba que tendió a demostrar la existencia de un galón con gasolina en el lugar de los hechos.

■ Resta preguntarnos si la ausencia de una etiqueta de identificación en el galón es razón suficiente para no admitirlo en evidencia. Entendemos que no. Los testimonios de todos los agentes que participaron en la custodia del objeto desde que se levantó del suelo por primera vez apoyan la identidad del objeto original con el que se ofreció en evidencia. En *United States v. Shackleford*, 738 F.2d 776, 785 (7mo Cir. 1984), se hizo un planteamiento igual al de autos. Los oficiales de la Policía omitieron identificar mediante etiquetas (*tags*) dos (2) objetos. El tribunal apelativo federal entendió que aun así el Ministerio Público logró establecer una adecuada cadena de custodia para la admisión del objeto y reiteró la norma de que las discrepancias con relación a la cadena de custodia van al peso de la prueba y no a la admisibilidad de la misma.

No se cometió error alguno al admitir en evidencia el galón, el cual se alega contuvo la gasolina con que quemaron el automóvil. Cualquier duda respecto a las irregularidades en la cadena de custodia fue resuelta por el panel de jurados contra la apelante Echevarría Rodríguez.

Además, distinto al caso de *Pueblo v. Carrasquillo Morales*, supra, en este caso existe prueba suficiente, independiente de aquella a que se refiere el planteamiento sobre cadena de custodia para sostener un veredicto de culpabilidad. En el caso antes citado se trataba del elemento principal del delito. En el caso de autos se trata de prueba o evidencia demostrativa que podemos calificar de corroborativa.

## Admisión de fotografías: inflamación del ánimo del Jurado

Afirma la apelante que incidió el tribunal al admitir en evidencia las fotografías tomadas durante los procedimientos de autopsia del cadáver del señor Vigoreaux, pues éstas servían el único propósito de inflamar el ánimo del Jurado.

Las fotografías constituyen el tipo de evidencia demostrativa que se utiliza con el propósito de ilustrar otra prueba. La Regla 80 de Evidencia, 32 L.P.R.A. Ap. IV, dispone que este tipo de evidencia sería admisible siempre que la misma: (1) sea pertinente a tenor con la Regla 18 (32 L.P.R.A. Ap. IV); (2) sea previamente autenticada, y (3) no sea necesario excluirla por algunos de los factores de la Regla 19 (32 L.P.R.A. Ap. IV). Esto es, una vez superados los problemas de pertinencia y autenticación, el tribunal deberá sopesar el valor probatorio de la evidencia demostrativa *vis-à-vis* el perjuicio, la confusión o la desorientación que podría acarrear su admisión.

En el caso particular de las fotografías, deberá considerarse, además, el propósito de la oferta de evidencia para así determinar si se persigue un fin de ilustración o un intento de prejuiciar el ánimo del Jurado. *Pueblo v. González Colón*, 110 D.P.R. 812 (1981); *Pueblo v. Fournier*, 80 D.P.R. 390 (1958). No obstante, el mero hecho de que una fotografía pueda impresionar

desfavorablemente al Jurado no justifica su exclusión. *Pueblo v. López Rodríguez*, 118 D.P.R. 515 (1987); *Pueblo v. Zayas Ortiz*, 65 D.P.R. 538, 541 (1946).

■ Si al ponderar el valor probatorio de las fotografías ofrecidas en evidencia y el efecto adverso que podría tener la admisión en el Jurado se determina que la evidencia tiene el propósito legítimo de ilustrar hechos esenciales sobre los cuales han declarado los testigos (*Pueblo v. Torres*, 75 D.P.R. 231, 235 (1953)), demostrar lesiones sufridas (*Pueblo v. Pacheco Stevenson*, 83 D.P.R. 842 (1961)) o para corroborar el testimonio de algún testigo (*Pueblo v. Rodríguez Colón*, 95 D.P.R. 614, 617–618 (1967)), deberá admitirse.

■ En el caso de autos, las fotografías sometidas en evidencia son pertinentes toda vez que se relacionan con hallazgos de los forenses al practicar la autopsia del occiso. No hay problemas de autenticación. Ahora bien, debemos considerar si en el ejercicio de su sana discreción, luego de ponderar los factores de la Regla 19 de Evidencia, *supra*, erró el tribunal al admitir la prueba. En las circunstancias de este caso, el valor probatorio de las fotos era incuestionable. La evidencia fue presentada con el propósito de corroborar la versión del testigo Newman (en oposición a la declaración del testigo "Bronco") sobre la forma en que se le causó la muerte al señor Vigoreaux y para aclarar las declaraciones incompatibles del patólogo forense, doctor Criado, sobre el objeto con que se le propinaron los punzonasos a la víctima. No puede negarse que la exposición a las fotografías conlleva la probabilidad de inflamar el ánimo del Jurado, pero en las circunstancias del caso de autos la balanza se inclina hacia su admisibilidad, tal como lo resolvió la juez de instancia.

No hubo abuso de discreción en su admisión y la línea jurisprudencial sobre este aspecto respalda tal decisión. La

determinación sobre la admisibilidad de tales fotografías debe, pues, sostenerse.[52]

*Evidencia excluida*

Sostiene la apelante que erró el tribunal sentenciador al denegar la admisión de ciertas fotografías y una grabación ofrecidas por la defensa como prueba de impugnación del testigo de cargo, Francisco "Papo" Newman. Se trata de varias fotografías y una grabación que describen varios actos obscenos e inmorales, alegadamente realizados por el testigo Newman junto a otras personas.

Argumenta la apelante que dicha prueba debió ser admitida en evidencia para impugnar la credibilidad del testigo Newman, ya que el Jurado tenía derecho a conocer que dicho testigo era una persona inmoral y degenerada que no le debe merecer credibilidad a persona alguna.

La norma general que gobierna lo concerniente a la impugnación de testigos está contenida en la Regla 44 de Evidencia, 32 L.P.R.A. Ap. IV. Establece dicha regla que la credibilidad de un testigo podrá ser impugnada mediante cualquier evidencia *pertinente al asunto de su credibilidad*, es decir, a la veracidad o mendacidad del testigo.

Específicamente, la Regla 45 de Evidencia, 32 L.P.R.A. Ap. IV, permite como uno de los medios de impugnación la admisión de evidencia sobre el carácter veraz o mendaz del testigo, así como evidencia de conducta específica, pero solamente cuando ésta se refiera directamente al asunto de la veracidad o mendacidad del testigo cuya credibilidad está bajo consideración.[53]

---

(52) Véase 1 *Weinstein's Evidence* Sec. 403[02] (1985); Chiesa, *op. cit.,* pág. 66; *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 300 (2do Cir. 1979).

(53) Sobre este tema véase E.L. Chiesa, *Evidencia de carácter y de conducta específica bajo las Reglas de Evidencia de 1979*, 15 (Núm. 3) Rev. Jur. U.I.A. 45 (1980).

 Así pues, de lo anterior resulta claro que en nuestro ordenamiento sólo se permite la impugnación de un testigo mediante evidencia de carácter o conducta específica si la misma se refiere al aspecto de veracidad o mendacidad únicamente. La prueba que no esté relacionada con dichos aspectos es inadmisible. En este caso la evidencia excluida nada tenía que ver con el carácter mendaz o veraz del testigo ni con actos específicos de mendacidad de parte de éste. Dicha evidencia sólo tendría el efecto de probar que el testigo Newman era "inmoral" en algunos aspectos de su vida, pero ello no implica que no fuera digno de credibilidad respecto a los hechos específicos sobre los cuales testificó.

Actuó correctamente el tribunal sentenciador al excluir dicha evidencia.[54]

## III

*Discusión de los errores imputados al foro juzgador por el apelante David López Watts*

Aun cuando en su escrito de apelación el apelante David López Watts planteó las cuestiones antes transcritas en su alegato, las reformuló en sólo cinco (5) cuestiones o errores que son los que se transcriben y discuten a continuación.

*Primer error*

Cometió grave error de derecho la Honorable Sala Sentenciadora al declarar al aquí apelante culpable y convicto del delito de Secuestro Agravado. Caso Núm. CR-86-59, Alegato del acusado apelante, pág. 29.

Expone el apelante, en síntesis, que la interceptación de la víctima y el subsiguiente traslado de ésta al lugar donde fue ultimada consistió en un acto incidental al propósito único de darle

---

[54] Hasta aquí la discusión de los señalamientos de error hechos por la apelante Echevarría Rodríguez, pues como indicáramos en el esc. 7 de esta opinión, aunque hizo otros en su escrito de apelación, renunció a los mismos. Alegato de la apelante, pág. 134.

muerte. Agrega que no existe prueba independiente a los efectos de establecer la intención específica o separada de privar a la víctima de su libertad. Añade que éste es un elemento del delito de secuestro y al no quedar configurado, según los hechos de este caso, procedía su absolución por el mismo.

El planteamiento presentado por el acusado no ha sido objeto de consideración previa por este Tribunal. En vista de ello, conviene hacer una breve exégesis acerca del delito en cuestión, según tipificado en nuestro ordenamiento penal, a la luz de su historial y de las experiencias de otras jurisdicciones con relación al mismo.

El delito de secuestro tiene sus raíces en el derecho común (*common law*), bajo cuya tradición desde muy temprano se le definía como "forcible abduction or stealing of a man, woman, or child from his own country and sending him into another". *1 Am Juris 2d Abduction and Kidnapping* Sec. 1, págs. 160–161 (1962). Véanse, además: *Doss v. State*, 123 So. 231 (Ala. 1929); *Ex Parte McDonald*, 146 P. 942 (Mont. 1915). Para este período se le consideraba como un delito menos grave (*misdemeanor*) en la mayor parte de las jurisdicciones norteamericanas. *Keith v. State*, 163 So. 136 (Fla. 1935). Más adelante, la primitiva concepción que exigía como elemento del delito que el secuestrado fuera trasladado de un estado a otro perdió vigencia en el propio derecho común, dando paso a la criminalización del acto, tanto intraestatal como interestatalmente. *Lee v. People*, 127 P. 1023 (Colo. 1912); *Midgett v. State*, 139 A.2d 209 (Md. 1958).

De igual manera, con el transcurso del tiempo la mayor parte de los estados de la unión americana y el propio Gobierno federal (18 U.S.C. sec. 1201) fueron enmendando sus respectivos estatutos a fin de conferirle al secuestro la condición de delito grave (*felony*). *People v. Tanner*, 44 P.2d 324 (Cal. 1935); *State v. Holland*, 45 So. 380 (La. 1907); *State v. Berry*, 93 P.2d 782 (Wash. 1939). Esto respondió principalmente a los sucesos del secuestro y al posterior asesinato del hijo de Charles A. Lindbergh en 1932. Para entonces, el secuestro era un delito menos grave en el estado de Nueva Jersey, donde tuvieron lugar tales sucesos. La conmo-

ción levantada por este caso en toda la nación y la frustación experimentada por las autoridades al confrontarse con la ridícula pena que aparejaba unos hechos tan siniestros movió primero al propio Gobierno federal y luego a casi todos los estados a enmendar sus respectivos estatutos, clasificando el secuestro como delito grave. Dispusieron, asimismo, penas considerablemente altas por su comisión, incluso la pena capital en algunos estados. Véase W.L. Prosser, *The Lindbergh Case Revisited: George Waller's Kidnap*, 46 Minn. L. Rev. 383 (1961). Al mismo tiempo, aun dentro de su clasificación como delito grave en numerosos estados, el mismo fue dividido en grados (*State v. Brown*, 312 P.2d 832 (Kan. 1957); *State v. Evans*, 243 P.2d 975 (Idaho 1952); *State v. Strauser*, 63 N.W.2d 345 (S.D. 1954)) y en otros fue clasificado a base de la modalidad de simple agravado (*People v. O'Farrell*, 325 P.2d 1002 (Cal. 1958); *Keith v. State*, supra; *Epperson v. State*, 6 N.E.2d 538 (Ind. 1937)).

El estatuto puertorriqueño sobre secuestro tiene un historial similar al experimentado en el derecho común. Es comprensible tal similitud si se considera que el Art. 137 del Código Penal de Puerto Rico de 1902, como en gran medida la parte especial de dicho código, procede del Código Penal californiano de 1873. Aunque después de su aprobación original en 1902 nuestro Código Penal ha sufrido varias reformas, principalmente las de 1937 y 1974 —cuyo resultado apunta hacia la introducción de elementos civilistas— [55] el delito que nos atañe continúa marcado y configurado singularmente por la tradición del *common law* de donde procede. Nótese que también nuestra disposición contenía en sus orígenes el elemento de la sustracción del secuestrado fuera de Puerto Rico o el propósito de sacarlo del país. Fue recientemente, al promulgarse el nuevo Código Penal de 1974, cuando se eliminó este elemento del delito. Véase D. Nevares-Muñiz, *Código Penal*

---

[55] Algunas disposiciones de nuestro actual Código Penal también han sido influenciadas por fuentes de tradición civilista, tales como el Proyecto Soler de un Código Penal para Argentina y el Proyecto Peco de un Código Penal para Uruguay. *Pueblo v. Burgos Torres*, 120 D.P.R. 709 (1988).

*de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo.
P.R., 1986, pág. 245.[56]

En el Código Penal de 1974[57] se definió el secuestro simple
de la manera siguiente:

> Toda persona que mediante fuerza, violencia, intimidación, fraude
> o engaño sustrajera a otra para privarla de su libertad, será
> sancionada con pena de . . . . 33 L.P.R.A. sec. 4178.

Más adelante, mediante la Ley Núm. 195 de 4 de agosto
de 1979 se aprobó el Art. 137A del Código Penal, 33 L.P.R.A. sec.
4178a, en el que se estableció la modalidad agravada del secues-
tro. Éste se configura al concurrir cualquiera de las siguientes
circunstancias, además de los elementos básicos que concurren en
su forma simple:

1. Cuando se cometa contra un menor de 18 años.
2. Cuando se viole, se inflija grave daño corporal o mutile
a la persona secuestrada.
3. Cuando se cometa contra el Gobernador, legislador, juez
o jefe de agencia.
4. Cuando se cometa con el propósito de exigir, se exija
compensación monetaria o se exija cualquier acto contrario a
la ley o a la voluntad del secuestrado, o para exigir al Estado
la liberación de alguna persona encarcelada o arrestada.

Bajo esta modalidad se disponen penas mucho más severas
que las contenidas en el secuestro simple, a saber: un término fijo
de sesenta (60) años o un término máximo indeterminado de hasta
noventa y nueve (99) años, de mediar circunstancias agravantes, y
un término mínimo indeterminado de hasta cuarenta (40) años, de
mediar circunstancias atenuantes. Sobre los propósitos de esta
enmienda, véanse: Exposición de Motivos de la Ley Núm. 195 de
4 de agosto de 1979, Leyes de Puerto Rico, págs. 597–598;
Nevares-Muñiz, *op. cit.*, págs. 240–247.

---

[56] Resulta incomprensible que esto no ocurriera hasta 1974, cuando ya desde 1932 la mayor parte de los estados habían eliminado este elemento de sus respectivos estatutos.

[57] Art. 137 (33 L.P.R.A. sec. 4178).

■ En vista de la procedencia e historia de nuestra ley sobre secuestro, al interpretarla, como se impone en este caso, debemos referirnos a la profusa experiencia del derecho común, sobre todo la de California,(58) de donde proviene.

Luego de un corto recorrido por distintos estados es fácil advertir que en el derecho común prevalece una norma de gran arraigo y solidez, consistente en que el delito de secuestro no se configura cuando la acción de sustraer a una persona constituye un acto incidental o inherente a la comisión de algún delito y dicha conducta no aumenta sustancialmente el riesgo de daño a la víctima. Según esta doctrina, se requiere demostrar una intención y unos hechos separados capaces de establecer el delito o delito primario. *Brinson v. State*, 483 So. 2d 13 (Fla. 1985); *People v. Fullwood*, 215 N.W.2d 594 (Mich. 1974); *People v. Mutch*, 482 P.2d 633 (Cal. 1971); *People v. Timmons*, 482 P.2d 648 (Cal. 1971); *People v. Apo*, 102 Cal. Rptr. 242 (1972); *People v. Daniels*, 459 P.2d 225 (Cal. 1969); *People v. Gwinn*, 314 N.W.2d 562 (Mich. 1981); *People v. White*, 363 N.W.2d 702 (Mich. 1984); *State v. Stewart*, 615 S.W.2d 600 (Mo. 1981); *State v. Price*, 327 S.E.2d 863 (N.C. 1985); *State v. Donald*, 386 N.E.2d 1341 (Ohio 1979).

Aunque la inmensa mayoría de los casos parecen estar contestes con esa norma básica, han surgido interpretaciones diversas respecto a los tipos de movimientos que constituyen meramente sustracciones incidentales o, más específicamente, en cuanto a la distancia requerida para que se configure el delito. También se han manifestado discrepancias en cuanto a si el riesgo de daño implica daños adicionales a los inherentes al delito primario o si más bien significa aumento en los riesgos de que el propio delito primario se consume o se facilite su comisión.

---

(58) Aunque la regla de hermenéutica legal es a los efectos de que al adoptarse un estatuto de un estado también se adopta la interpretación que el más alto Tribunal del estado ha dado al estatuto, en Puerto Rico hemos expresado que no estamos constreñidos a seguir dicha regla de hermenéutica en todos los casos. La misma está sujeta a limitaciones o excepciones. *Pueblo v. Pacheco*, 83 D.P.R. 526 (1961); *Pueblo v. Matos*, 83 D.P.R. 335 (1961). De todas maneras, cuando la interpretación del tribunal del estado sea posterior a la adopción del estatuto en Puerto Rico, como ha ocurrido en el presente caso, la misma sólo tendrá valor persuasivo en nuestra jurisdicción. *Pueblo v. Cirino*, 69 D.P.R. 525 (1949).

En cuanto al factor de la distancia o el movimiento de la víctima al ser sustraída incidentalmente, en varios casos se ha decidido que no es necesario que se haya movido a ésta a través de una distancia sustancial a fin de determinar si se ha configurado o no el delito de secuestro. Basta con que se dé cualquier movimiento, aunque sea de sólo algunos pies e incluso dentro de una misma estructura para que ese resultado se produzca. Véanse, *v. gr.*: *State v. Buggs*, 547 P.2d 720 (Kan. 1976); *State v. Rabon*, 563 P.2d 300 (Ariz. 1977); *Turner v. State*, 645 P.2d 971 (Nev. 1982); *State v. Whittington*, 347 S.E.2d 403 (N.C. 1986); *State v. Davidson*, 335 S.E.2d 518 (N.C. 1985); *State v. Rendahl*, 650 P.2d 128 (Or. 1982); *State v. Perry*, 567 P.2d 786 (Ariz. 1977); *State v. Pickett*, 589 P.2d 16 (Ariz. 1978); *State v. Molitoni*, 711 P.2d 1303 (Hawaii 1985); *Faison v. State*, 426 So. 2d 963 (Fla. 1983). Se podrá notar que en la mayoría de los casos citados se trataba de movimientos de la víctima de un cuarto a otro dentro de la misma residencia o establecimiento. No obstante lo anterior, en otros estados —principalmente en California— los tribunales han considerado como elemento necesario que la sustracción de la cual haya sido objeto la víctima implique una distancia sustancial.

Este criterio ha sido interpretado de modo más o menos restrictivo por diversos tribunales, ya que lo que para uno puede significar distancia sustancial, para otro no lo es. Véase, *v. gr.*, *People v. Lara*, 528 P.2d 365 (Cal. 1974). Sin embargo, independientemente del alcance o de la interpretación que cada uno en particular aplique a este concepto, abundante jurisprudencia ha descansado directa o indirectamente en el mismo como fundamento preponderante en su decisión respecto a si se cometió o no el delito de secuestro. Refiéranse, por ejemplo: *In re Earley*, 534 P.2d 721 (Cal. 1975); *People v. Stathos*, 94 Cal. Rptr. 482 (1971); *People v. Mutch*, supra; *State v. Couch*, 635 P.2d 89 (Utah 1981); *State v. Folck*, 325 N.W.2d 368 (Iowa 1982); *State v. Coberly*, 661 P.2d 383 (Kan. 1983); *Com. v. Hughes*, 399 A.2d 694 (Pa. 1979); *State v. Malone*, 472 N.E.2d 1122 (Ohio 1984). Si bien en algunos de los casos examinados no se aborda o se articula directamente el criterio de la distancia, del análisis empleado por el tribunal o

de la decisión emitida se desprende que fue una circunstancia tomada en consideración.

■ Algo parecido al anterior elemento ocurre con el aumento sustancial del riesgo de daño. En un número considerable de casos, este factor se ha interpretado en el sentido de que implica aumento de riesgo de daños más allá del inherente al delito que se interesa cometer primariamente. En estos casos, los tribunales concentran su atención en determinar si el acto de mover a la víctima añade riesgos de que a ésta se le ocasione daños adicionales a los que de ordinario habría de causársele con la mera comisión del delito primario. Si se responde en la afirmativa, se configura el delito de secuestro. Véanse, en relación con esta postura: *People v. Mays*, 95 Cal. Rptr. 190 (1971); *People v. Hunter*, 97 Cal. Rptr. 29 (1971); *Beck v. United States*, 402 A.2d 418 (Cir. D.C. 1979); *People v. Hardesty*, 241 N.W.2d 214 (Mich. 1976); *Stalley v. State*, 541 P.2d 658 (Nev. 1975); *State v. Tucker*, 346 S.E.2d 417 (N.C. 1986); *State v. Malone*, supra. Evidentemente, dicha corriente no acoge la tesis de que el mero propósito de facilitar el delito principal es suficiente para el encausamiento por el delito de secuestro. *United States v. Moore*, 688 F.2d 433 (6to Cir. 1982); *In re Crumpton*, 507 P.2d 74 (Cal. 1973); *People v. Hempton*, 204 N.W.2d 684 (Mich. 1972).

Varias jurisdicciones, en cambio, favorecen una interpretación distinta sobre esta cuestión. Si no de modo directo, a juzgar por la postura adoptada en los casos, un gran número de tribunales considera que el aumento del riesgo de daño implica mejorar las condiciones o hacer más propicio o probable la comisión de algún delito grave. Según esa visión, se sostiene que si la acción de remover a la víctima aumenta el riesgo de que el delito primario pueda consumarse, esto es, que la remoción de la víctima facilite el delito primario o la huida, o meramente dificulte la identificación, se comete tanto el delito de secuestro como el delito primario. *State v. Johnson*, 716 P.2d 1368 (Kan. 1986); *State v. Weigel*, 612 P.2d 636 (Kan. 1980); *State v. Williams*, 602 P.2d 1332 (Kan. 1979); *State v. Handsome*, 266 S.E.2d 670 (N.C. 1980); *Beck*

*v. United States,* supra; *State v. Fulcher,* 243 S.E.2d 338 (N.C. 1978); *State v. Cobb,* 243 S.E.2d 759 (N.C. 1978); *Harkins v. State,* 380 So. 2d 524 (Fla. 1980); *State v. Stewart,* supra.

Naturalmente, no debe tratarse de meras especulaciones o atisbos de posibles daños desprovistos de probabilidad. Se exige que ese aumento de riesgos sea real y sustancial.

A medida que se examina la controversia es fácil advertir que no es producto de la casualidad que se registren posiciones tan divergentes en Estados Unidos sobre este asunto. Se trata de una cuestión de difícil interpretación por sus profundas implicaciones para el acusado y la comunidad. Eso promueve o estimula que se generen líneas de interpretación distintas en orden a las circunstancias particulares o intereses de cada jurisdicción. De ahí que, al intentar conferirles contornos claros y precisos a nuestro estatuto sobre secuestro, si bien resulta conveniente mirar la experiencia de estos estados, no debemos sustraernos de nuestro contexto y realidad particular. Con esta premisa en mente consideremos la relevancia al delito de secuestro, según lo define nuestro Código Penal, de las doctrinas de derecho común que hemos examinado.

En primer término, nos parece sabia y justa la norma general que excluye como conducta constitutiva de secuestro aquella consistente en la sustracción incidental de la víctima con miras a la comisión de algún delito. Resulta, en consecuencia, apropiado y conveniente su adopción en nuestra jurisdicción. Ahora bien, se impone la necesidad de delimitar en lo posible sus contornos y características a la luz de las modalidades y tendencias antes examinadas.

Con miras a lograr ese propósito, pasemos juicio primeramente sobre el elemento o factor de la distancia. El concepto "distancia" está necesariamente vinculado al carácter incidental del movimiento de la víctima. Es difícil concebir una sustracción incidental cuando la víctima ha sido trasladada a través de una distancia considerable o sustancial. Al elaborarse la doctrina de la sustracción incidental, se pensaba en situaciones en las que el movimiento era en la misma área o periferia en la que se

perpetraba el delito primario. De ahí que se le considerara incidental.

En *People v. Stathos*, supra, pág. 485, el Tribunal Supremo de California se expresó sobre esta cuestión en los términos siguientes:

> The word "incidental" is defined as "subordinate, nonessential, or attendant in position or significance"—"occurring merely by chance or without intuition or calculation . . . ." (Webster's Third New Internat. Dict.)
>
> The Supreme Court has repeatedly emphasized that, in the *Daniels* context, it gives the word a similar meaning. It has consistently qualified its use of the term "incidental" by the adverb "merely". In *Daniels*, describing its intended meaning, it used or adopted such expressions as, movements which "'were those *natural in*'" the crime involved, "brief movements", "mere movement of the victim of a crime should not inevitably lead to the criminal's being indicted for kidnapping." "'[I]t is difficult to conceive a situation in which the victim of a robbery does not make some movement under the duress ocasioned by force or fear'", "[i]t is a common occurrence in robbery, for example that the victim be * * * *moved into and left in another room or place*", a true kidnapping situation does not exist where the asportation "'played no significant role in the crimes'", and "'trivial changes of location having no bearing on the evil at hand.'" (Énfasis en el original y citas omitidas.)

Como acertadamente señala el Tribunal Supremo de California, al cometerse delitos de robo, al igual que violaciones y muchos tipos de asesinatos, entre otros, es común que se mueva a la víctima del lugar donde se encuentra. En vista de ello, resulta peligroso y extremo acoger el enfoque de movimientos breves como constitutivos de secuestro, particularmente cuando este delito podría implicar mayores penas que las relativas a los delitos primarios. De ahí que al interpretarse el elemento de la sustracción resulte más justo y atinado aplicar el criterio de distancia sustancial. Obsérvese que el Código Penal Modelo, en su Sec. 212.1, acoge este criterio en el delito de secuestro allí tipificado. Dispone el Código Penal Modelo lo siguiente: "A person is guilty of kidnapping if he unlawfully removes another from his place of

residence or business, or a *substantial distance* from the vicinity where he is found, or if he unlawfully confines another for a substantial period in a place of isolation . . . ." (Énfasis en el original suprimido y énfasis suplido.) *American Law Institute, Model Penal Code and Commentaries* Parte II, Sec. 212.1, págs. 209–210.

En referencia a este requisito de distancia sustancial, en los comentarios de la citada sección del Código Penal Modelo se dice lo siguiente:

> This phrasing of the asportation requirement eliminates the absurdity of liability for kidnapping where a robber forces his victim into his own home or into the back of a store in order to retrieve valuables located there. For situations in which the victim is seized elsewhere than in his residence or place of business, the section requires removal "a substantial distance from the vicinity where he is found." By using the word "vicinity" rather than "place" and by speaking only of "substantial" removal, the provision precludes kidnapping convictions based on trivial changes of location having no bearing on the evil at hand. Thus, for example, the rapist who forces his victim into a parked car or dark alley may be punished quite severely for the crime of rape, but he does not thereby also become liable for kidnapping. *American Law Institute, Model Penal Code and Commentaries,* supra, págs. 223–224.

Entre los fundamentos que sostienen la adopción de esta norma, en el Código Penal Modelo se destaca el temor avalado por la experiencia habida en aquellos casos en que se encausaba como el delito de secuestro la conducta criminal que racionalmente implicaba la comisión de otro delito que generalmente aparejaba penas menos severas. Véase Senate Comm. on the S. Judiciary Report No. 549 (1977), sobre críticas a la actual disposición federal respecto a este mismo asunto.

En *Wharton's Criminal Law* se abunda de manera ilustrada en esta cuestión al señalarse:

> At times, in commiting the crime of robbery or rape, the victim may be moved, as where a robbery victim is pushed from the sidewalk into a nearby alley or hallway so that his wallet can be

taken, where a robbery victim is pushed from room to room in his home so that the house can be searched for valuables, or where a rape victim is pushed from the sidewalk into a nearby alley. Ordinarily, in such cases, the movement, being merely incidental to the commission of the crime of robbery or rape, will not constitute the separate offense of kidnapping. Similarly, a movement of the victim which is merely incidental to the commission of some other crime will not constitute the separate offense of kidnapping. Most kidnapping statutes seek to achieve this result by requiring that the interference with liberty be "substantial". (Escolios omitidos.) 2 *Wharton's Criminal Law* Sec. 210, págs. 59–60 (1979).

Las anteriores expresiones confirman la sabiduría del requisito de distancia sustancial, a fin de que se pueda configurar el delito de secuestro, en lugar de meros o breves movimientos de las víctimas realmente incidentales a la comisión del delito, que originalmente constituye el objetivo de la intención criminal.

Aunque la distancia sustancial no es un concepto específico o de claros perfiles, consideramos que la definición dada por el Código Penal Modelo recoge ciertos criterios capaces de ilustrar al juzgador al momento de evaluar esta cuestión y deslindar su alcance. Nos referimos a expresiones tales como "removes another from his place of *residence* or *business*, or a substantial distance from the *vicinity* where he is found" —(énfasis en el original suprimido y énfasis suplido) *American Law Institute, Model Penal Code and Commentaries,* supra, págs. 209–210)— las cuales excluyen meros movimientos dentro de la misma residencia o negocio y sustracciones, incluso dentro del área o vecindario inmediato en que se encuentre la víctima al ocurrir los hechos.

En armonía con las anteriores consideraciones, adoptamos en nuestra jurisdicción esta corriente interpretativa que acoge el elemento de la distancia sustancial por considerarla más justa y acertada.

Ahora bien, respecto al elemento de aumento del riesgo de daño, abrigamos reservas en cuanto a su adopción en Puerto Rico en cualquiera de las corrientes o modalidades previamente comentadas. En cuanto a la modalidad que interpreta el aumento

del riesgo de daño como *la mera facilitación* del delito primario, la misma entraña el peligro de que se incurra en el delito de secuestro en la inmensa mayoría de los casos en que de manera incidental a la comisión de un delito se traslade a una persona del sitio específico donde originalmente se encuentra, toda vez que ordinariamente la sustracción de la víctima tiende a mejorar sustancialmente las condiciones para perpetrar el acto delictivo primario. Precisamente ese es el propósito evidente en la mayoría de los casos en que se incurre en ese tipo de conducta. Generalmente se traslada a la víctima porque el lugar donde ésta se encuentra es inadecuado para poder llevar a cabo los objetivos delictivos. La adopción de esta modalidad implicaría la virtual abrogación de la excepción de la sustracción incidental como constitutiva de secuestro, dado que tales sustracciones normalmente tienden a hacer más propicio o a facilitar el delito, con lo cual se supone que aumente el riesgo de daño a la luz de esta corriente interpretativa.

En lo que concierne a la segunda modalidad, esto es, al *aumento del riesgo más allá del inherente al delito primario*, si bien ésta parece más razonable, al menos en su forma teórica, cuando se examina a la luz de la realidad práctica resulta tan extrema como la anterior. Téngase presente que si el lugar hacia donde se conduce a la víctima es apropiado para la comisión del delito primario, muy probablemente también lo sea para cometer otros delitos o infligir otros daños. Es sabido que generalmente las sustracciones incidentales están íntimamente relacionadas a los delitos de asesinato, robo, violaciones, mutilaciones y torturas. Todos estos son actos que exigen del actor mucha agresividad y predisposición a infligir daños. De ahí que es lógico concebir que tales sustracciones, en la medida en que hacen más propicio la comisión del delito primario, aumenten significativamente el riesgo y, por ende, las probabilidades de que el autor inflija daños adicionales a la víctima. Es a lo sumo posible que se incremente el riesgo de sufrir daños adicionales en casos de movimientos cortos o breves como, por ejemplo, de un cuarto a otro en busca de algún objeto dentro de una misma residencia o dentro de un negocio. Sin

embargo, ello de todos modos no constituiría secuestro por no representar una distancia sustancial según la interpretación que hemos adoptado anteriormente.

Adviértase que esta doctrina se enfoca no en el hecho consumado del daño, sino en el aumento del riesgo. Ese riesgo implica cierto grado de especulación. Entraña la probabilidad de que el daño que se vislumbra no ocurra a pesar de su aparente inminencia. Bajo esta situación, resultaría injusto e improcedente penalizar a alguna persona meramente por lo que pudo ocurrir o por daños que se pudieron haber causado cuando tal vez ni siquiera se intentaron. No empece los grandes riesgos de daños a los que se pueda exponer a una víctima con el acto de la sustracción, probablemente en algunos casos no se forje tal intención ni se conciba infligirlos. Esa situación de aprehensión y angustia que quizás experimente la víctima —de sufrir daños adicionales a un robo o a una violación, por ejemplo— podría configurar, tal vez, algún otro delito o una causa de acción de daños y perjuicios, pero no un secuestro. No debe perderse de vista que dicho delito, aun en su modalidad simple, acarrea severas penas, por lo que el mismo debe ser interpretado con criterios restrictivos. Además, estos elementos especulativos o de incertidumbre, sobre todo en la segunda modalidad, son ajenos al principio de legalidad y especificidad de la norma penal, por lo que deben evitarse. *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139, 145–146 (1973); *Pueblo v. Tribunal Superior*, 98 D.P.R. 750 (1970).

■ Por los motivos antes expresados, favorecemos que no se acoja este elemento en Puerto Rico en ninguna de sus modalidades o acepciones. Sin embargo endosamos, como ya adelantamos, que nuestra disposición de secuestro, tanto en su modalidad simple como en la agravada, incluso el inciso (b) del Art. 137A del Código Penal, *supra*, sea interpretada a los efectos de requerir que la sustracción de la víctima sea sustancial y no meramente incidental a la comisión de algún delito.

Con el beneficio del marco doctrinal expresado, veamos si se incurrió o no en el error señalado.

Surge de la prueba admitida que el apelante López Watts junto al testigo Newman interceptaron al Sr. Luis Vigoreaux en el Expreso de Trujillo Alto, en jurisdicción de ese municipio, y lo trasladaron a un apartado sector de Cupey Alto conocido como Los Guanos. De un sector al otro median varias millas de distancia y su recorrido en automóvil toma alrededor de quince (15) minutos a una velocidad promedio de treinta y cinco (35) a cuarenta (40) millas por hora. Consideramos que esos hechos no se ajustan a los criterios que antes expusimos relativos a la sustracción incidental. No se trataba de un mero movimiento de un cuarto a otro dentro de una residencia o estructura, ni de breves sustracciones en el área donde se cometía el delito primario o en su periferia. Ni siquiera consistió en movimientos dentro del área o vencindario en que ocurrió la sustracción. Existen elementos suficientes para considerar que en este caso medió una distancia sustancial en cuanto a la sustracción de la cual fue objeto la víctima. De manera que, independientemente de la intención o de los propósitos principales o primarios del apelante, al efectuar la sustracción no puede catalogarse ésta como incidental o accidental. Por las características y circunstancias particulares que informan estos hechos, los mismos configuran un delito separado y distinto de cualquier otro.

Luego de lo anterior, resta por considerar si se incurrió o no en el delito de secuestro en su modalidad agravada. No cabe duda que los hechos acaecidos en el caso de autos configuran los elementos básicos del delito de secuestro en su modalidad simple. En primer término, se privó de su libertad a la víctima. El hecho de que dicha privación se efectuara con el propósito último de darle muerte *no impide que se tuviera, además, la intención específica de coartar su libertad.* De hecho, la modalidad agravada de este delito considera claramente circunstancias en las que con el secuestro se persiguen distintos propósitos ulteriores, como por ejemplo, exigir compensación monetaria, que se libere algún recluso o detenido, o que se realice cualquier acto contrario a la ley. Resultaría absurdo interpretar que el requisito de intención específica excluye cualquier otro propósito último o subsiguiente

del secuestrador. Generalmente, no se priva de la libertad a una persona con ese sólo propósito. Por el contrario, normalmente se pretende con ello adelantar otros objetivos principales o ulteriores. En este caso se *optó* deliberadamente por privar a la víctima de su libertad, lo cual implica intención específica, con el fin de facilitar su asesinato. El hecho de que no existiera un plan preconcebido para la privación de la libertad, como alega el apelante, no implica necesariamente la ausencia de intención específica. Para que ésta se configure no se requiere de una previa planificación ni de que se conciba con mucho tiempo de antelación a los hechos. Puede, incluso, formarse unos minutos previo a su ejecución. Véase, por analogía, *Pueblo v. Torres Montañez*, supra, pág. 129.(59)

Respecto al segundo y tercer elemento, ambos también se configuraron claramente, toda vez que de la prueba surge que se *sustrajo* a la víctima habiendo mediado *fuerza* o violencia.

Ahora bien, ¿está presente en estos hechos alguna de las circunstancias consideradas en el delito de secuestro agravado? Veamos. Al apelante se le acusó de secuestro agravado a la luz del Art. 137A(b) del Código Penal, *supra*, el cual considera como modalidad agravada del delito infligir grave daño corporal al secuestrado. Alega el apelante que el daño corporal que se le causó a la víctima fue su muerte y que eso da lugar a un delito distinto. No le asiste la razón al apelante. Nótese que surge de la prueba que previo a colocar al Sr. Luis Vigoreaux en el baúl del automóvil, le asestaron graves heridas con un objeto punzante y que, estando ya en el baúl, lo golpearon fuertemente en la cabeza con una llave luego de que Newman se propusiera sacar un maletín del baúl y el Sr. Vigoreaux le agarrara el brazo. Más tarde, habiendo transcurrido un lapso de tiempo significativo, período durante el cual Newman y el apelante López Watts fueron a comprar gasolina a una estación localizada en una urbanización de Cupey, procedieron a quemar el vehículo. Todos estos inciden-

---

(59) En este caso se dijo que el lapso de tiempo para que tenga lugar la deliberación en casos de asesinato puede ser "tan rápido como el pensamiento". *Pueblo v. Rosario*, 67 D.P.R. 371, 375 (1947).

tes corroborados por evidencia médica demuestran que estando con vida la víctima, incluso al quemar el automóvil, le causaron graves daños corporales.

De manera que, independientemente de que las heridas infligidas pudieran haberle causado la muerte al Sr. Luis Vigoreaux, es incontrovertible que estando éste vivo se le causó grave daño corporal. Coincidimos con la profesora Nevares-Muñiz, *op. cit.*, pág. 247, en el sentido de que "[el inciso (b) del Art. 137A] es independiente a los delitos de mutilación, tentativa de asesinato o agresión agravada de naturaleza grave que puedan concurrir como parte de un curso de conducta durante el secuestro". Considérese, finalmente, que para asesinar a la víctima no era necesario infligirle todas las heridas que se le propinaron, por las cuales debió haber sufrido con igual intensidad que cualquiera otra persona que no hubiera resultado muerta. De esos hechos puede concebirse la intención de causar daño corporal en adición a la intención de causar la muerte ilegal (constitutiva de asesinato) a la víctima.

A la luz de los hechos expuestos, podemos concluir que se han conformado en este caso los elementos esenciales del secuestro agravado, según tipificado en el Art. 137A(b) del Código Penal, *supra.*

 Por otra parte, al discutir el error en cuestión, el apelante trae a colación la figura del "concurso de delitos". Según las circunstancias presentes, en este caso son improcedentes o redundantes los planteamientos vertidos sobre el particular. En los casos en los que un acto u omisión o un curso de conducta sea penable de distintos modos por diferentes disposiciones legales, el Art. 63 del Código Penal, 33 L.P.R.A. sec. 3321, dispone que el mismo se castigue sólo con arreglo a una de ellas. Ahora bien, eso de ninguna manera impide que el acusado sea procesado y convicto por todas las disposiciones penales infringidas. Según hemos señalado, el acto del secuestro por el cual fue convicto el acusado no constituye ni forma parte del acto de dar muerte ilegal a un ser humano mediando malicia premeditada (el cual consti-

tuye el delito de asesinato). El primero no está inmerso ni constituye un elemento del segundo; cada uno de ellos constituye un delito independiente y separado. Por lo tanto, no es de aplicación a este caso la proscripción recogida en el Art. 63 del Código Penal, *supra*. El citado artículo no es de aplicación cuando el acusado persigue varios objetivos criminales independientes entre sí y no meramente incidentales, pudiendo ser castigado por los delitos independientes cometidos en la persecución de cada objetivo, aunque los delitos dependan de actos comunes o sean parte del curso de conducta de otra forma indivisible. *Pueblo v. Millán Meléndez*, supra; *Pueblo v. Feliciano Hernández*, 113 D.P.R. 371 (1982); *Pueblo v. Suárez Fernández*, 116 D.P.R. 842 (1986).

En lo que respecta al segundo párrafo del referido Art. 63, el cual dispone que la absolución o convicción por sentencia bajo alguna de esas disposiciones impedirá todo procedimiento judicial por el mismo acto u omisión bajo cualquiera de las demás, tampoco tiene relación con los hechos acaecidos en este caso. Esa sección lo que prohíbe es someter a una persona a un nuevo procedimiento a base de unos hechos por los cuales se le haya juzgado previamente, aunque bajo una disposición penal distinta. Como hemos visto, tampoco estos son los hechos de este caso. Aquí se procesó al apelante López Watts por distintos delitos simultáneamente, resultando absuelto en uno y culpable en otros. En fin, el "concurso de delitos" no tiene ninguna aplicabilidad o pertinencia a estos hechos.

▬▬ Por último se alude, además, en este primer señalamiento de error a la doctrina de vaguedad. De entrada cabe precisar que no porque un estatuto requiera interpretación adolece necesariamente de vaguedad. En *In re Guzmán. Géigel*, 113 D.P.R. 122, 129 (1982), citado con aprobación en *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 544 (1984), se alertaba precisamente de no caer en "la superficialidad de creer que una ley penal es nula por defecto de vaguedad debido a que requiera interpretación". Como correctamente se señala, además, en *Vélez v. Srio. de*

*Justicia,* supra, pág. 544, "'todas las leyes, aun las "clarísimas" requieren interpretación'". Véase *Pueblo v. Tribl. Superior,* 81 D.P.R. 763 (1960). En cuanto al delito que nos concierne, aunque amerita que se interpreten ciertos extremos, sus elementos esenciales son claros. Aun en lo relativo al elemento de .la sustracción, el mismo informa adecuadamente, aunque de modo general, sobre la necesidad de que la víctima sea movida del lugar donde se encuentra. No adolece este estatuto del referido problema.

*Segundo error*

> Erró la Honorable Sala Sentenciadora en el ejercicio de su discreción al imponer las sentencias con agravantes y en forma consecutiva. Las sentencias así impuestas son excesivamente altas, constituyen una violación al debido proceso de ley y a la prohibición contra castigos crueles e inusitados. Caso Núm. CR-86-59, Alegato del acusado apelante, *supra.*

En *Pueblo v. Rivera Torres,* 121 D.P.R. 128 (1988), y *Pueblo v. Santiago Acosta,* supra, reafirmamos la norma básica de que normalmente no intervendremos con el ejercicio de la discreción del juez de instancia en la imposición de la pena, salvo en casos de claro abuso de discreción. Ello responde a que "debemos respetar la amplia rectitud decisoria del foro de instancia". *Pueblo v. Rivera Torres,* supra, pág. 140. Naturalmente, al ejercer su discreción los magistrados deben usarla sabia y prudentemente. De ahí que "[a]l fijar la pena [con agravantes, los tribunales] deben seguir los criterios establecidos en la Regla 171 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, a tenor con los hechos y circunstancias de cada caso en particular y la situación individual de cada convicto". *Pueblo v. Castro Muñiz,* 118 D.P.R. 625, 632 (1987). De la prueba desfilada ante el tribunal sentenciador surge claramente la presencia de algunas de las circunstancias agravantes recogidas en dicha regla sobre las cuales fundamentó el juzgador su dictamen, tales como: (1) actos de violencia, grave daño corporal y hechos que revelen crueldad; (2) designios criminales planificados; (3) el hecho de que el acusado recibiera

compensación o un beneficio por la comisión del delito, y (4) la utilización de un arma en dicha comisión. Regla 171(a), (b), (i) y (j) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Independientemente de la procedencia o no del inciso (m) de la regla anterior, respecto al historial delictivo del apelante —el cual fue alegado por el Fiscal en su moción sobre agravantes y objetado por el acusado— el tribunal tenía ante sí suficientes circunstancias adicionales que le permitían imponer penas agravadas y de manera consecutiva en este caso.

En cuanto al planteamiento de la ausencia de la vista dispuesta por la Regla 162.4 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, para la discusión de la referida moción sobre agravantes, en reiteradas ocasiones hemos expresado que la misma es innecesaria cuando no existe alguna controversia real sobre un hecho material que requiera la presentación de prueba. *Pueblo v. Santiago Acosta*, supra; *Pueblo v. Castro Muñiz*, supra. Si bien había controversia sobre el inciso (m) de la Regla 171 de Procedimiento Criminal, *supra*, éste no constituía un hecho material, toda vez que existía evidencia adicional, sólida y suficiente que establecía otras circunstancias sobre las cuales el tribunal orientó su discreción en la imposición de estas penas.

Tampoco procede el argumento de que las penas impuestas constituyen un castigo cruel e inusitado. Esta cláusula constitucional, en la acepción que nos ocupa, exige que se tenga una razonable proporción entre la pena impuesta y la conducta delictiva penada por ley. *Pueblo v. Pérez Zayas*, 116 D.P.R. 197 (1985); *Solem v. Helm*, 463 U.S. 277 (1983). En la consideración de este balance, el tribunal debe sopesar, de un lado, la severidad de la pena y, del otro, la gravedad de la conducta criminal a la luz de los factores siguientes: (a) daño causado a la víctima y a la sociedad, y (b) culpabilidad del convicto. Este último factor se refiere a la actitud mental del acusado al perpetrar los hechos, esto es, al *mens rea. Solem v. Helm*, supra. Además debe tomarse en consideración si el convicto tendrá oportunidad de disfrutar del beneficio de libertad bajo palabra. *Rummel v. Estelle*, 445 U.S.

263 (1980); *Solem v. Helm,* supra. En el caso de autos, si bien las penas son altas, la conducta delictiva del acusado hacia la víctima constituyó tortura, lo cual por su crueldad y gravedad estremeció y conmovió a toda nuestra sociedad. En lo tocante al factor de la culpabilidad, la prueba estableció abrumadoramente la culpabilidad del apelante por los delitos de que fue convicto, al tiempo que se trataba de conducta criminal planificada, deliberada, ejecutada con gran frialdad y cuyo móvil era el dinero. Además, el apelante tiene a su disposición los remedios de la libertad bajo palabra cuando cualifique para ello, lo cual puede significar la reducción de hasta más de la mitad de la pena impuesta. El planteamiento, por lo tanto, es inmeritorio.

 Por último, se apoya el apelante en la inconsistencia del veredicto para objetar la decisión del tribunal de imponer penas tomando en consideración circunstancias agravantes. Discrepamos. La inconsistencia del veredicto del Jurado no tiene porqué afectar la facultad del tribunal de imponer penas agravadas a la luz de los hechos y circunstancias de este caso. Téngase presente que independientemente de que al apelante se le absolviera del delito de asesinato, de la evidencia para establecer los delitos por los cuales fue convicto, particularmente del secuestro agravado, surgen todas las circunstancias agravantes señaladas con antelación, sobre las cuales el tribunal pudo correctamente ejercitar su discreción. No necesitaba descansar para ello en la prueba de asesinato. Evidentemente, para que el Jurado encontrara culpable al apelante por los delitos imputados debió haber dado credibilidad a la prueba presentada en relación con los otros delitos, irrespectivamente de que esos veredictos resultaran inconsistentes con el fallo absolutorio. Esa es prerrogativa legítima del Jurado. Después de todo, la facultad del Jurado de emitir fallos inconsistentes, asunto que fue ya objeto de consideración, lejos de perjudicar ha beneficiado a este apelante. No puede lamentarse el acusado cuando en algo esto no le beneficie.

Consideramos que no hay abuso de discreción en la imposición de las penas por circunstancias agravantes en este caso ni en su

cumplimiento en forma consecutiva, por lo que debemos declinar intervenir con tales determinaciones.

*Tercer y cuarto error*

La conducta impropia observada por los fiscales a lo largo del proceso, privó al acusado de un juicio justo e imparcial y de contar con un debido proceso de ley.

Cometió grave error el Tribunal de Instancia al admitir evidencia y al permitir que se continuara el proceso a[u]n cuando se estableció la ocultación de prueba por el Ministerio Público, no empece haber sido advertidos por el Tribunal mediante orden y gestión de la defensa, sobre la necesidad de revelar toda la evidencia en su poder a ser utilizada en el juicio. Todo ello en violación a la garantía constitucional del debido proceso de ley. Caso Núm. CR-86-59, Alegato del acusado apelante, págs. 29–30.

En su alegato, el apelante comienza la discusión de estos señalamientos expresando su objeción a que se autorizara la presentación de nuevas acusaciones en este caso contra él y la señora Echevarría Rodríguez, cuando con anterioridad a estos incidentes se habían archivado unas primeras acusaciones fundamentadas en los mismos hechos presentados contra la coacusada Lydia Echevarría y otros acusados. Aunque el acusado López Watts no articula claramente su objeción ni el fundamento de la misma, asumimos que se apoya en la prohibición contenida en el inciso (d) de la Regla 247 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, a los efectos de que el sobreseimiento decretado de acuerdo con esta regla impedirá un nuevo procedimiento por los mismos hechos. No obstante, de una lectura de la Resolución de 20 de mayo de 1985 de la Juez Superior, Hon. Ygrí Rivera, que desestimó las primeras acusaciones, surge que tal acción fue tomada al amparo de la Regla 64(p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, por no haberse determinado causa probable para acusar conforme a derecho. Nótese que la Regla 67 de ese mismo cuerpo legal, 34 L.P.R.A. Ap. II, autoriza el inicio de un nuevo procedimiento en caso de una desestimación bajo la Regla 64(p) de Procedimiento Criminal, *supra*.

Finalmente, considérese que el planteamiento en cuestión lo levanta el apelante López Watts, el cual no figuraba como acusado en el primer procedimiento, por lo que el mismo es no sólo inmeritorio sino, además, impertinente en lo que a este acusado concierne. Objeta, además, el apelante el hecho de que se exhumara el cadáver de la víctima sin que se observaran los procedimientos legales correspondientes, así como el que se le practicara una segunda autopsia sin que se le notificara de la misma.

 En primer término, a quienes compete levantar la objeción a la exhumación del cadáver es a las personas allegadas a la víctima que pueden demostrar lesión a su intimidad o a las autoridades públicas concernientes. El apelante no forma parte de ninguno de esos grupos. En cuanto al otro punto, consideramos que el Fiscal, dentro de su función de investigar cualquier muerte ilegal, tiene la facultad de practicar nuevas autopsias si considera que la hecha previamente no fue adecuada o necesita de la misma para esclarecer su investigación. Como cuestión de hecho, tuvo ocasión el acusado de impugnar dicha prueba o procedimiento e incluso obtuvo copia del segundo protocolo de autopsia —como en efecto ocurrió según surge de la Minuta de 11 de octubre de 1985— a tenor con la Regla 95 de Procedimiento Criminal, *supra*. De hecho, en el caso de autos el acusado tuvo amplia oportunidad en el juicio de interrogar a los médicos que practicaron dicha autopsia sobre sus propósitos y hallazgos. El Jurado tuvo ante su consideración esa prueba y juzgó su valor y pertinencia como estimó procedente, incluso, por supuesto, el interrogatorio y contrainterrogatorio del doctor Fossum. En lo concerniente a este testimonio, refiérase a las pág. 334.

Continúa el apelante López Watts en su alegato —con relación a los señalamientos de error tercero y cuarto que nos ocupan— planteando la ocultación de evidencia exculpatoria o evidencia que venía obligado a revelar el Ministerio Público al acusado, en vista de la moción sobre descubrimiento de prueba presentada por López Watts.

Por imperativo del debido proceso de ley, el Ministerio Fiscal tiene el deber de revelar cualquier evidencia exculpatoria, testimonio perjuro o indicios de falsedad en la prueba que tenga en su poder. *Pueblo v. Rodríguez Sánchez*, supra; *United States v. Agurs*, supra. Asimismo, según la Regla 95 de Procedimiento Criminal, *supra*, el acusado tiene derecho a inspeccionar libros, documentos, objetos y a obtener cualquier declaración jurada propia, mas no las de otras personas mientras éstas no hayan declarado en el examen directo. *Pueblo v. Delgado López*, 106 D.P.R. 441 (1977). Véanse, además, sobre este particular, pero con referencia a la apelante Echevarría Rodríguez, las pág. 325.

Sobre este extremo resulta evidente que el apelante confrontó dificultades e inconvenientes para lograr obtener la información requerida al Fiscal. Empero, independientemente de lo anterior, del expediente surge que la defensa tuvo acceso a la prueba o a documentos a los cuales tenía derecho. Aun cuando alguna no se le hubiera entregado antes del juicio, obtuvo la información durante el transcurso del mismo sin que se demostrara perjuicio alguno para el apelante por este motivo. Tal fue el caso del testigo Manuel Lecaroz, respecto al cual alegaba el apelante que el Fiscal poseía testimonio perjuro que debió revelar. El mismo consistía en dos (2) declaraciones previas del testigo que se alegaban eran contradictorias. Del propio alegato del apelante López Watts surge que la defensa tuvo la oportunidad de obtener esa información a tiempo, al menos su contenido esencial, y hacerla llegar al conocimiento del Jurado. De manera que no sufrió el acusado perjuicio alguno. Asimismo, respecto a ciertas admisiones del acusado López Watts, que según la defensa el Fiscal también tenía en su poder sin revelarlas, también se desprende del propio alegato del apelante que esa prueba no ocasionó perjuicio al apelante toda vez que la misma no fue admitida. Algo parecido ocurrió, además, con las declaraciones grabadas del testigo Cartagena Rosa, que contenían alegadamente admisiones del apelante y que la defensa tuvo acceso a ello el día antes de la fecha señalada para el juicio, cuando fue revelada por Fiscalía. Sin

embargo, debido fundamentalmente a esa situación, el juicio se pospuso por cerca de cinco (5) meses. Así se desprende de la Minuta de 11 de octubre de 1985, ocasión en la que se discutió precisamente la suspensión del juicio y de la cual surge, incluso, una orden del propio tribunal a los abogados —tanto de López Watts como de Echevarría Rodríguez— a los efectos de que examinaran esa y otra evidencia puesta a su disposición por la Fiscalía, para lo cual les concedió hasta el 22 de noviembre de 1985. De suerte que, independientemente de que el Fiscal demorara la entrega de dicha evidencia, en vista de la suspensión del juicio, la defensa de ambos apelantes tuvo oportunidad suficiente para estudiar la misma antes de su presentación en el juicio.

El apelante también señala en su discusión de estos errores que el tribunal permitió la identificación del acusado en corte abierta por la testigo Cruz María Ortiz en una segunda comparecencia de ésta debido a que en una primera ocasión, que tuvo lugar varios días antes, no se efectuó tal identificación. El Procurador General resume adecuadamente lo acontecido con esta testigo. De su alegato reproducimos, con algunas pequeñas variantes o correcciones, el relato siguiente sobre el testimonio de la testigo Ortiz.

Esta testigo declaró que para el día de los hechos (17 de enero de 1983) prestaba servicios domésticos en la residencia de la apelante y que ese día la apelante salió a reunirse con los abogados (de ella y de Vigoreaux) en el Condominio El Centro. Declaró, además, que el 13 de enero de 1983 un joven —cuya descripción coincidía con la del apelante López Watts— fue a la casa preguntando por una cartera que se le había quedado allí, y que se identificó como "David". Esa persona estuvo hablando con la apelante por unos quince (15) o veinte (20) minutos. En el examen directo no se le preguntó a la testigo que identificara a esa persona si se encontraba en corte. El licenciado Galib, abogado de Echevarría Rodríguez, contrainterrogó a la testigo. T.E. de 31 de marzo de 1986, págs. 24–71. Como parte del contrainterrogatorio (íd., págs. 46–48), se señaló que durante la investigación del caso la testigo, cuando le mostraron los agentes investigadores unas

fotografías para identificar a la persona que había ido a casa de la apelante el 13 de enero de 1983, señaló la fotografía de un sujeto a quien apodaban "el Chino" y "el Dominicano". La licenciada Pesante, abogada de López Watts, optó por no contrainterrogar. Íd., pág. 71. En el redirecto el Ministerio Público (íd., págs. 72–112) se propuso rehabilitar a la testigo y le pidió que identificara a esa persona en corte (si ésta estaba allí). Se suscitó entonces un planteamiento de derecho (íd., págs. 74–98). Se retiró al Jurado y se argumentó la cuestión. El Ministerio Público expresó que limitó su examen directo a lo que estimó suficiente a los fines de la prueba de cargo (que una persona que se autoidentificó como David y que fue descrito por la testigo con características como las de David López Watts estuvo en casa de la apelante el 13 de enero de 1983) pero que luego, en contrainterrogatorio, se impugnó a la testigo con relación al aspecto crucial de la confiabilidad de la descripción que dio, restándole valor probatorio significativo a la evidencia circunstancial de que se trataba del apelante. Ante esa situación, se señaló que el Ministerio Fiscal estimó que podía rehabilitar a su testigo por medio de una identificación personal en corte. Finalmente, el Ministerio Fiscal hizo una oferta de prueba en ausencia del Jurado (íd., págs. 99–100) y la testigo identificó al apelante en corte como la persona que estuvo en casa de la señora Echevarría Rodríguez el 13 de enero de 1983. El tribunal rechazó la prueba ofrecida por el Ministerio Público (íd., págs. 112–113) por lo que en ese momento no pasó al Jurado la identificación hecha en corte.

Posteriormente, sin embargo, el tribunal permitió esa identificación. La testigo Ortiz declaró nuevamente el 9 de abril de 1986, y a preguntas del Ministerio Fiscal —en reapertura del redirecto— identificó en corte al apelante, señor López Watts, como la persona que había ido a casa de la señora Echevarría Rodríguez en enero de 1983 buscando una cartera que se le había quedado allí. T.E. de 9 de abril de 1986, págs. 383–384. La testigo expresó que la visibilidad con relación a la percepción del apelante en casa de la señora Echevarría Rodríguez era buena y que estaba claro, pues vio al apelante en la entrada de la casa. Al mostrársele la

fotografía de "el Chino", la testigo respondió que cuando se la enseñaron en septiembre de 1984 se le parecía a la persona que había ido a casa de Echevarría Rodríguez en enero de 1983. Íd., págs. 391–392.

La licenciada Pesante contrainterrogó abarcadoramente a la testigo (T.E. de 9 de abril de 1986, págs. 343–420). La esencia del contrainterrogatorio fue la impugnación de la testigo en dos (2) extremos: (1) que anteriormente había dicho, con relación a "el Chino" y la fotografía, que lo reconoció inmediatamente como la persona que estuvo en casa de la apelante Echevarría Rodríguez en enero de 1983; (2) que a pesar de haber visto en corte al apelante López Watts durante los meses de octubre, noviembre, diciembre, enero y febrero (1985–1986), no fue hasta fines de marzo que dijo a los Fiscales que se trataba de la persona que había estado en casa de la apelante Echevarría Rodríguez en enero de 1983. Hasta aquí el resumen de lo acontecido con relación a la testigo Cruz María Ortiz.

 Es preciso señalar que el tribunal pudo haber permitido la identificación en la primera comparecencia de la testigo al tribunal cuando el Ministerio Público se propuso rehabilitarla luego de ella haber sido impugnada en el contrainterrogatorio a base de una identificación previa en la que identificaba como la persona a una distinta al apelante. *Pueblo v. Ríos Nogueras*, 114 D.P.R. 256, 260–261 (1983). Véanse, además: Regla 43(C) de Evidencia, 32 L.P.R.A. Ap. IV; Regla 128 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. En esa primera ocasión, el Fiscal hizo una oferta de prueba en ausencia del Jurado y la testigo identificó al apelante en corte. Empero, tal ofrecimiento se declaró sin lugar. Fue, entonces, en la próxima comparecencia cuando pudo esta testigo identificar al acusado ante el Jurado. La preocupación expresada por el apelante respecto a que fuera identificado por la testigo en su segunda comparecencia —luego de haber estado ésta expuesta a influencias, especialmente por la publicidad que obtuvo el juicio— se disipa si se considera que en la oferta de prueba hecha en la primera ocasión se identificó a la

misma persona. Al permitirse la identificación en esta segunda ocasión, lo que en efecto se hizo fue rectificar el error previamente cometido y hacer llegar al Jurado la oferta de prueba hecha originalmente.

■ Además, debe considerarse que la defensa tuvo amplia oportunidad de impugnar a la testigo a base de la identificación hecha antes del juicio, en la que mediante fotos identificó a una persona distinta al apelante, por lo que el Jurado tuvo ocasión de aquilatar dicha prueba y conferirle el valor probatorio que le mereció. A base de esas consideraciones, si en algún error incurrió el tribunal sobre el particular, el mismo no fue perjudicial. No se hubiera alterado el resultado del dictamen del Jurado de no haberse cometido. *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988).

■ En lo que concierne a la otra información que alega el apelante tener derecho a obtener del Fiscal, por alegadamente constituir prueba exculpatoria según supuestamente surge de las declaraciones juradas de "Bronco", Perla Faith y Marylin Cintrón, un examen de tales declaraciones revela que no contenían prueba de ese tipo. Sobre lo que constituye prueba exculpatoria, véanse las págs. 333–334. Esas declaraciones juradas en rigor pertenecen al sumario fiscal, por lo que no son susceptibles de descubrimiento sino hasta después del examen directo del testigo. *Pueblo v. Ribas*, 83 D.P.R. 386 (1961).

*Quinto error*

El efecto acumulativo de los errores cometidos durante el juicio constituye una privación del debido proceso de ley que por disposición constitucional debe proteger a todo ciudadano. Caso Núm. CR-86-59, Alegato del acusado apelante, pág. 30.

■ La corriente doctrinal en que se apoya este señalamiento de error está orientada hacia el examen de la totalidad de los errores no perjudiciales en los que se haya incurrido durante el juicio. La metodología de análisis de este asunto consiste en que una vez determinado que en efecto se cometieron errores en el

proceso, corresponde examinar si se trataba de errores perjudiciales o no perjudiciales, según ya han sido definidos. Si se determinara que sólo se incurrió en errores no perjudiciales, procede entonces ponderar si todos ellos considerados conjuntamente "adquiere[n] proporción y relieve de error que transgrede las garantías básicas". *Pueblo v. González Colón*, supra, pág. 831, opinión concurrente del Juez Asociado Señor Díaz Cruz. Esto es, que evaluados en conjunto, de no haberse cometido todos ellos, el resultado final del caso hubiera sido distinto. *Rose v. Clark*, 478 U.S. 570 (1986).

En cuanto a este asunto, cabe ante todo consignar que los errores señalados por los apelantes en rigor no se cometieron. Aunque en el procedimiento seguido en este caso se podría identificar alguna que otra situación que se debió haber evitado o donde se pudo haber actuado de modo más apropiado, consideramos que tales situaciones no alcanzan el calificativo de errores de derecho como tales, ni siquiera de naturaleza no perjudicial. Debe recordarse que el derecho a un juicio justo no significa el derecho a un juicio perfecto. *Pueblo v. López Rodríguez*, supra. Mientras nos corresponda a los seres humanos impartir justicia, esta delicada tarea, por imperativos de nuestra naturaleza, tendrá que descargarse de manera imperfecta.

No obstante, considerando tales posibles errores como errores de derecho no perjudiciales, opinamos que los mismos, examinados en conjunto, no ameritan la revocación de la sentencia. Todos ellos no tienen el efecto de hacer probable un resultado distinto al que se llegó si no se hubieran cometido.

Por las consideraciones anteriores, *procede dictar sentencia confirmatoria de las sentencias del Tribunal Superior de Puerto Rico, Sala de San Juan, que son objeto de los presentes recursos.*

El Juez Asociado Señor Negrón García concurre con el resultado. El Juez Asociado Señor Rebollo López disiente con opinión escrita.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La muerte de uno de nuestros conciudadanos, ocurrida como consecuencia de la comisión de unos hechos delictivos, en adición a un profundo sentimiento de pena y coraje, causa en los demás ciudadanos sentimientos de frustración y de responsabilidad; *lo anterior, no hay duda, debido a que la contínua repetición de hechos delictivos significa que el sistema de gobierno bajo el cual convivimos no está funcionando adecuada y correctamente.* Cuando la víctima de esos hechos delictivos ha sido nuestro amigo, dichos sentimientos se acrecientan. Es por ello que la muerte del Sr. Luis Vigoreaux, Q.E.P.D., produjo en nuestra ciudadanía emociones y sentimientos tan fuertes. A través de la radio y la televisión el señor Vigoreaux, quien dedicó su vida a entretener y alegrar la existencia de los demás, se convirtió en parte integral de la vida de todos los ciudadanos de este País. Su muerte, sin duda, constituyó para la ciudadanía el deceso de un amigo.

Ello no obstante, no podemos brindarle nuestra conformidad a la opinión que en el día de hoy emite una mayoría de los integrantes del Tribunal en los casos de epígrafe; Opinión mayoritaria mediante la cual este Tribunal confirma las convicciones y sentencias que se decretaron e impusieron, en el Tribunal Superior de Puerto Rico, Sala de San Juan, a los apelantes Lydia Echevarría Rodríguez y David López Watts. *Si trágica y sentida fue la muerte del señor Vigoreaux, desafortunada en extremo fue la conducta observada por el Estado en la investigación y el procesamiento de los alegados responsables del mencionado y vicioso hecho delictivo,* conducta del Estado que culminó en las convicciones y sentencias que hoy están ante nuestra consideración; *convicciones y sentencias que, en el caso particular de la apelante Lydia Echevarría, resultan ser inclusive nulas.*

I

Bajo nuestro sistema republicano de gobierno, la Rama Ejecutiva tiene la obligación constitucional de poner en vigor y de velar por que se cumplan —a través de su Departamento de Justicia— las leyes que aprueba la Rama Legislativa. La tercera rama de gobierno, la Rama Judicial, tiene la obligación de resolver si esa legislación cumple con todos y cada uno de los mandatos de la Constitución del Estado Libre Asociado de Puerto Rico y si la Rama Ejecutiva —el "Estado"— ha ejercido su obligación de poner en vigor dicha legislación acorde con las referidas disposiciones constitucionales y las demás leyes que componen nuestro ordenamiento jurídico. Este Tribunal, en consecuencia, es el máximo *custodio y defensor* de la *pureza y corrección* que debe imperar en la implantación de las leyes por parte del Estado y en los procedimientos judiciales que se llevan a cabo en los tribunales de instancia de nuestro País.

La opinión mayoritaria emitida, al confirmar las sentencias apeladas, *avala y condona una de las páginas más tristes y lamentables en nuestra historia de pueblo civilizado en lo concerniente a la observancia de los derechos civiles de nuestros ciudadanos y al derecho de todo acusado a tener un juicio justo e imparcial,* derechos garantizados por la Constitución del Estado Libre Asociado de Puerto Rico y la Constitución de los Estados Unidos de América. Al así actuar, esa mayoría pasa totalmente por alto el hecho de que "el Estado", y el Departamento de Justicia que lo representa en los procesos criminales, desde un punto de vista "jurídico e histórico" son uno sólo; *esto es, el Estado y sus instituciones son un ente contínuo que no es afectado por los cambios en el "personal" directivo de la Rama Ejecutiva que ocurren como consecuencia del advenimiento al escenario político de nuevas administraciones de gobierno.*

En relación con la fase investigativa y procesal de los casos ante nuestra consideración, *la actuación y conducta observada por el "Estado", y su Departamento de Justicia, es una que verdaderamente resulta difícil de aceptar por aquellos que, desde*

*este estrado apelativo, tenemos la difícil y sensitiva encomienda de impartir justicia en nuestro País.* Nuestro ordenamiento jurídico provee un procedimiento para que el culpable de la comisión de unos hechos delictivos pague por su conducta antisocial y criminal. Ese mismo ordenamiento, sin embargo, garantiza a *todo* ciudadano residente en nuestro País —no importa su origen, condición social, color o raza— que ese procedimiento criminal pautado será uno justo e imparcial donde el propio "Estado" viene en la obligación de garantizarle un debido procedimiento de ley; ello independientemente de la gravedad de los hechos delictivos que se le imputen haber cometido a ese ciudadano.

*El procedimiento a que fueron sometidos los aquí apelantes es un vivo ejemplo de uno totalmente viciado desde sus comienzos hasta su final.* El mismo fue uno donde muchos de los funcionarios, depositarios de la grave responsabilidad de garantizar unos derechos constitucionales, aparentemente antepusieron sus intereses personales y políticos al objetivo y propósito de todo proceso criminal: la búsqueda de la verdad y el castigo del culpable en un proceso justo e imparcial donde se ha observado el debido procedimiento de ley. *Todo lo que se necesita para poderse uno percatar de los graves errores cometidos, y de lo viciado del procedimiento seguido a nivel de instancia, es una simple lectura de la opinión mayoritaria emitida. Ello resulta ser tan flagrante y aparente que realmente no hay necesidad de señalarlo y destacarlo.*

Es debido a esta situación que —no obstante la horrible forma y manera en que la víctima en el presente caso fue privada de su vida, y de la posibilidad de herir las sensibilidades de las distintas personas que participaron a lo largo de todo el procedimiento— *no podemos permanecer en silencio ante lo que consideramos un desvarío de la justicia.* Es por ello que disentimos.